**THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION** | * | |
| | * | **CIVIL ACTION** |
| **This document relates to:** | * | |
| **BRIDGE HOUSE CORPORATION** | * | |
| **Case No. 1:18-op-46061** | * | **MDL No. 2804** |
| **VERSUS** | * | **CASE No. 1:17-MD-2804** |
| **Purdue Pharma, L.P.; Purdue Pharma,** | * | |
| **Inc.; The Purdue Frederick Company,** | * | **HON. DAN A. POLSTER** |
| **Inc.; Teva Pharmaceutical Industries,** | * | |
| **LTD.; Teva Pharmaceuticals USA, Inc.;** | * | |
| **Cephalon, Inc.; Johnson & Johnson;** | * | **AMENDED COMPLAINT** |
| **Janssen Pharmaceuticals, Inc.; Ortho-** | * | |
| **McNeil-Janssen Pharmaceuticals, Inc.** | * | |
| **n/k/a Janssen Pharmaceuticals, Inc.;** | * | |
| **Janssen Pharmaceutica, Inc. n/k/a** | * | |
| **Janssen Pharmaceuticals, Inc.;** | * | |
| **Noramco, Inc.; Endo Health Solutions,** | * | |
| **Inc.; Endo Pharmaceuticals, Inc.;** | * | |
| **Allergan PLC f/k/a Actavis PLC;** | * | **JURY TRIAL DEMANDED** |
| **Watson Pharmaceuticals, Inc. n/k/a** | * | |
| **Actavis, Inc.; Watson Laboratories,** | * | |
| **Inc.; Actavis, LLC; Actavis Pharma,** | * | |
| **Inc. f/k/a Watson Pharma, Inc.;** | * | |
| **Mallinckrodt PLC; Mallinckrodt LLC;** | * | |
| **Insys Therapeutics, Inc.;** | * | |
| **McKesson Corporation; Cardinal** | * | |
| **Health, Inc.; and** | * | |
| **AmerisourceBergen Drug Corporation** | * | |
| **Richard Sackler; Kathe Sackler;** | * | |
| **Jonathan Sackler;Theresa Sackler;** | * | |
| **Mortimer D.A. Sackler;Ilene Sackler;** | * | |
| **Beverly Sackler;David Sackler,** | * | |
| **Pars, Rhodes Tech;** | * | |
| **Rhodes Pharma; Rhodes Inc,;** | * | |
| **Trust for the Benefit of Members** | * | |
| **of the Raymond Sackler Family;** | * | |
| **P.F. Laboratories, Inc.;Par** | * | |
| **Pharmaceuticals Inc., Anda;CVS** | * | |

**Health Corp.;Rite Aid Corporation;** *
**Walgreens Boots Alliance, Inc.;** *
**Walgreen Co., and, Wal-Mart Inc.** *

## AMENDED COMPLAINT

Bridge House Corporation ("Plaintiff") submits this Supplemental and Amended Complaint incorporating as if fully set forth herein its own prior pleadings.

## INCORPORATION BY REFERENCE OF EXISTING COMPLAINT

1. Plaintiff's existing complaint is expressly incorporated by reference to this Amended and Supplemental Complaint.

## PARTIES – DEFENDANTS

2. In addition to those defendants identified in Plaintiff's existing Complaint, Plaintiffs assert claims against the following additional parties as set forth below.

3. Plaintiff is are now adding as defendants those members of the Sackler Families and their controlled entities who knowingly participated in and approved Purdue's misconduct as alleged in this Amended Complaint, and all of whom knowingly received the benefits derived from Purdue's misconduct. These individuals, Richard Sackler, Kathe Sackler, Jonathan Sackler, Theresa Sackler, Mortimer D.A. Sackler, and Ilene Sackler, are known, *both individually and collectively*, as "Sackler Family Defendants".

4. Defendant Richard S. Sackler is a natural person residing in Greenwich, Connecticut. He is a son of Raymond Sackler and, beginning in the 1990's, served as a member of the Board of Directors of Purdue and Purdue-related entities.

5. Defendant Jonathan D. Sackler is a natural person residing in Fairfield County, Connecticut and, upon information and belief, New York State. He is a son of Raymond Sackler and has been a member of the Board of Directors of Purdue and Purdue-related entities since the

1990s.

6. Defendant Mortimer D.A. Sackler is a natural person residing in New York County, New York. He is the son of Mortimer Sackler and has been a member of the board of directors of Purdue and Purdue-related entities since the 1990s.

7. Defendant Kathe A. Sackler is a natural person residing in Fairfield County, Connecticut, and, upon information and belief, New York State. She is the daughter of Mortimer Sackler and has served as a member of the board of directors of Purdue and Purdue-related entities since the 1990s.

8. Defendant Ilene Sackler Lefcourt is a natural person residing in New York County, New York. She is the daughter of Mortimer Sackler and has served as a member of the board of directors of Purdue and Purdue-related entities since the 1990s.

9. Defendant Beverly Sackler is a natural person residing in Fairfield County, Connecticut. She is the widow of Raymond Sackler and has served as a member of the board of directors of Purdue and Purdue-related entities since the 1990s.

10. Defendant Theresa Sackler is a natural person residing in New York County, New York. She is the widow of Mortimer Sackler and has served as a member of the board of directors of Purdue and Purdue-related entities since the 1990s.

11. Defendant David A. Sackler is a natural person residing in New York County, New York. He is the son of Richard Sackler (and thus grandson of Raymond Sackler) and has served as a member of the board of directors of Purdue and Purdue related entities since 2012.

12. Defendant Trust for the Benefit of Members of the Raymond Sackler Family (the "Raymond Sackler Trust") is a trust of which Defendants Beverly Sackler, Richard S. Sackler, and/or Jonathan D. Sackler are trustees.

13. The Raymond Sackler Trust is a direct or indirect beneficial owner of 50% of Purdue as well as the recipient of 50% of the profits of Rhodes Pharma Inc. and PF Labs.

14. Defendant Rhodes Technologies Inc. ("Rhodes Tech Inc.") is a Delaware corporation formed on January 28, 1999 with its principal place of business in Coventry, R.I. Rhodes Tech Inc. is a general partner of Rhodes Tech. At relevant times, Rhodes Tech Inc. has manufactured and supplied Purdue with oxycodone, the active pharmaceutical ingredient in OxyContin, for use in the manufacture of pharmaceutical preparations or has managed Rhodes Tech or its predecessor in doing so.

15. Defendant Rhodes Pharmaceuticals L.P. ("Rhodes Pharma") is a Delaware limited partnership formed November 9, 2007 with its principal place of business in Coventry, R.I. At all relevant times, Rhodes Pharma has marketed a generic form of OxyContin manufactured by Purdue Pharmaceuticals L.P. ("PPNC"), a Delaware limited partnership that is also a subsidiary of Defendant PPLP; PPNC owns and operates a pharmaceutical manufacturing facility in Wilson, North Carolina.

16. Defendant Rhodes Pharmaceuticals Inc. ("Rhodes Pharma Inc.") is a New York corporation formed on November 9, 2007. Rhodes Pharma Inc. is a general partner of Rhodes Pharma. At all relevant times, Rhodes Pharma Inc. has marketed a generic form of OxyContin being manufactured by PPNC.

17. Defendant Rhodes Technologies ("Rhodes Tech") is a Delaware general partnership formed on April 12, 2005 with its principal place of business in Coventry, R.I. At relevant times, Rhodes Tech or its predecessor has manufactured and supplied Purdue with oxycodone, the active pharmaceutical ingredient in OxyContin, for use in the manufacture of pharmaceutical preparations.

18. Defendant The P.F. Laboratories, Inc. ("PF Labs") is a New Jersey corporation with its principal place of business located in Totowa, New Jersey. It was, at relevant times, engaged in the business of manufacturing OxyContin for Purdue. At all relevant times, PF Labs has been beneficially owned, managed, and controlled by Sackler Family Defendants.

19. Defendant Par Pharmaceutical, Inc. is a New York corporation with its principal place of business located in Chestnut Ridge, New York. Par Pharmaceutical, Inc. is a wholly-owned subsidiary of Par Pharmaceutical Companies, Inc. f/k/a Par Pharmaceutical Holdings, Inc.

20. Defendant Par Pharmaceuticals Companies, Inc. is a Delaware corporation with its principal place of business located in Chestnut Ridge, New York (Par Pharmaceutical, Inc. and Par Pharmaceutical Companies, Inc. are referred to collectively as "Par Pharmaceutical"). Par Pharmaceutical is an affiliate of Defendants Endo Health Solutions Inc. ("EHS") and Endo Pharmaceuticals, Inc. ("EPI). EHS, EPI, and Par Pharmaceutical, and their DEA registrant subsidiaries and affiliates (collectively, "Endo"), manufacture opioids sold throughout the United States including in Louisiana.

21. Defendant SpecGx LLC is a Delaware limited liability company with its headquarters in Clayton, Missouri, and it is a wholly-owned subsidiary of, upon information and belief, MNYC, MPLC and MLLC, and SpecGx LLC and their DEA registrant subsidiaries and affiliates (together, "Mallinckrodt") manufacture, market, sell and distribute pharmaceutical drugs throughout the United States, including in Louisiana. Mallinckrodt is the largest U.S. supplier of opioid pain medications and among the top ten generic pharmaceutical manufacturers in the United States, based on prescriptions.

22. Defendants Richard S. Sackler, Jonathan D. Sackler, Mortimer D.A. Sackler, Kathe A. Sackler, Ilene Sackler Lefcourt, Beverly Sackler, Theresa Sackler, David A. Sackler, Rhodes

Tech, Rhodes Tech Inc., Rhodes Pharma, Rhodes Pharma Inc., Raymond Sackler Trust, PF Labs, Par Pharmaceutical, Inc., Par Pharmaceutical Companies, Inc., Mallinckrodt plc, Mallinckrodt LLC, and SpecGx LLC are sometimes referred to collectively as the "Pharmaceutical Defendants."

23. Defendant Insys Therapeutics, Inc. ("Insys") is a Delaware corporation with its principal place of business in Chandler, Arizona. Insys develops, markets, and sells prescription drugs, including Subsys, a sublingal spray of fentanyl, in, upon information and belief, Plaintiffs' counties and nationally.

24. At all times relevant hereto, Defendant CVS Health Corporation ("CVS") is a Delaware corporation with its principal place of business in Rhode Island. At all times relevant hereto, CVS, through its various DEA registered subsidiaries and affiliated entities, conducted business as a licensed wholesale distributor. CVS also operated retail stores in numerous States, including in Louisiana, that sell prescription medicines, including opioids.

25. At all times relevant to this Amended Complaint, CVS distributed prescription opioids and engaged in the retail selling of opioids throughout the United States, including Louisiana.

26. Defendant Rite Aid Corporation is a Delaware corporation with its principal offices located in Camp Hill, Pennsylvania ("Rite Aid").

27. At all times relevant hereto, Rite Aid, through its various DEA registered subsidiaries and affiliated entities, conducted business as a licensed wholesale distributor. At all times relevant hereto, Rite-Aid also operated retail stores, including in Louisiana, that sell prescription medicines, including opioids.

28. Defendant Walgreens Boots Alliance, Inc., is a Delaware corporation with its principal place of business in Illinois. Defendant Walgreen, Co. is a subsidiary of Walgreens Boots

Alliance that operates retail drug stores. Together, Walgreens Boots Alliance, Inc., and Walgreen Co. are referred to as "Walgreens."

29. Walgreens, through its various DEA registered subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor. At all times relevant to this Amended Complaint, Walgreens distributed prescription opioids and engaged in the retail selling of opioids throughout the United States, including in Louisiana.

30. Defendant Wal-Mart Inc. ("Wal-Mart"), is a Delaware corporation with its principal place of business in Bentonville, Arkansas. Walmart, through its various DEA registered affiliated entities, conducts business as a licensed wholesale distributor. At all times relevant to this Amended Complaint, Wal-Mart distributed prescription opioids and engaged in the retail selling of opioids throughout the United States, including in Louisiana.

31. In their capacity as wholesale distributors, Insys, Anda, CVS, Rite-Aid, Walgreens, and Wal-Mart are sometimes referred to as "Distributor Defendants". To the extent they are sued with respect to their activities as retail sellers of prescription opioids, CVS, Rite-Aid, Walgreens, and Wal-Mart are referred to herein as "Retail Chain Pharmacies" or "Retail Chain Pharmacy Defendants." The allegations pertaining to the Retail Chain Pharmacies that form the basis of Plaintiff's claims against these defendants are set forth below.

## AMENDED BACKGROUND FACTS

Structure of the Purdue Entities and the Roles of the Individual Purdue-Related Defendants

32. Purdue is part of a greater, complicated web of entities through which the Sackler Families operate. PPI is the managing general partner of PPLP and of many of the various Purdue-related entities. Its status as managing general partner of the various entities ensures PPI's control of those entities. In turn, at all relevant times, all of the members of the board of PPI have been

Sackler Family Defendants and Sackler-family retainers. The entities directly or indirectly related to Purdue that are not controlled by the Sackler Family Defendants through PPI are, nonetheless, controlled by the Sackler Family Defendants through different entities presently unknown to Plaintiffs. For instance, at all relevant times, the Sackler Family Defendants and the Sackler Families controlled PF Labs and Rhodes Pharma.

33. Because the Sackler Family Defendants and/or the Sackler Families control of the board of PPI, all of the officers employed by PPI and PPLP reported to them. This ensured Sackler domination and control of PPI and PPLP, even when the officers of those entities were not themselves members of the Sackler Families or Sackler Family Defendants.

34. The Sackler Family Defendants and/or Sackler Families are beneficial owners of, and exercise complete domination and control over, all four Rhodes-identified Defendants and PF Labs.

35. The Sackler Family Defendants and/or Sackler Families Sackler approved the decision to enter the generic market for OxyContin in or about 2008, and that it should do so through Rhodes Pharma, a Sackler-owned entity created for that purpose.

36. The Sackler Family Defendants and/or Sackler Families caused Purdue and other associated companies that they beneficially owned and controlled to distribute to the Sackler Families hundreds of millions of dollars of profits earned by Purdue and its associated companies from the sale of opioids.

37. Each of the Sackler Family Defendants named herein has served on the board of directors of, or as an officer of, Purdue and one or more Purdue-related business entities, like PF Labs.

38. The Sackler Family Defendants beneficially own and control all of the entities

owned by the Sackler Families, including PF Labs and the Rhodes Defendants, in substantially the same way as they control PPLP and its affiliates, although they may do so using different holding companies and trusts than those used to control PPLP.

39. At all relevant times, Richard Sackler played an active and central role in the management of Purdue and the Purdue-related business entities. He began working for Purdue as Assistant to the President (his father, Raymond) in the 1970s. He later served as Vice President of Marketing and Sales. In the early 1990s he became Senior Vice President, which was the position he held at the time OxyContin was launched in 1996. In 1999, he became President, and he served in that position until 2003.

40. Richard Sackler resigned as President in 2003, apparently due to a concern that executive officers of Purdue would be held personally liable for opioid-related liabilities and crimes. However, he continued to serve, with his uncle Mortimer, as Co-Chair of the Board of Purdue. In that way, among others, the family maintained control over their family business, even though they were no longer officers, because the officers reported to them.

41. As a senior executive of Purdue, Richard Sackler was actively involved in the invention, development, marketing, promotion, and sale of Purdue’s opioid products, including OxyContin. He worked tirelessly to make OxyContin a blockbuster, telling colleagues how devoted he was to the drug’s success. Along with his father (Raymond) and his uncle (Mortimer), he launched OxyContin with one of the biggest pharmaceutical marketing campaigns in history, deploying many persuasive techniques pioneered by his uncle Arthur. Within five years of its introduction, OxyContin was generating a billion dollars a year. When OxyContin met with resistance, Richard participated in Purdue’s efforts to counter that resistance.

42. At all relevant times, Richard Sackler served as a trustee of one or more trusts that

beneficially own and control Purdue and the Purdue-related business entities.

43. Richard Sackler is the direct or indirect beneficiary of some portion of 25% of the profits earned by Purdue and the Purdue-related business entities named herein as additional defendants from the sale of opioids.

44. Jonathan Sackler was a Vice President of Purdue in 1991, and by 2000 he was a Senior Vice President. Like his brother Richard, he resigned that position in or after 2003, apparently due to a concern that executive officers of Purdue would be held personally liable for opioid-related liabilities and crimes. However, he continued to serve on the board of Purdue.

45. At all relevant times, Jonathan Sackler served as a trustee or one or more trusts that beneficially owns and control Purdue and the Purdue-related business entities.

46. Jonathan Sackler is the direct or indirect beneficiary of some portion of 25% of the profits earned by Purdue and the Purdue-related business entities from the sale of opioids.

47. Mortimer D.A. Sackler served as a Vice President of Purdue during the period of the development, launch, and promotion of OxyContin. He resigned that position in or after 2003, apparently due to a concern that executive officers of Purdue would be held personally liable for opioid-related liabilities and crimes. However, he continued to serve on the Board of Purdue.

48. Mortimer D.A. Sackler is the direct or indirect beneficiary of 7.14% of the profits earned by Purdue and the Purdue-related business entities from the sale of opioids.

49. Kathe A. Sackler was a Vice President of Purdue in 1991, and by 2000 she was a Senior Vice President. She resigned that position in or about 2003 due to a concern that executive officers of Purdue would be held personally liable for opioid-related liabilities and crimes. However, she continued to serve on the Board of Purdue.

50. Kathe A. Sackler is the direct or indirect beneficiary of 7.14% of the profits earned

by Purdue and the Purdue-related business entities from the sale of opioids.

51. Ilene Sackler Lefcourt served as Vice President of Purdue during the period of the development, launch, and promotion of OxyContin. She resigned that position in or after 2003, apparently due to a concern that executive officers of Purdue would be held personally liable for opioid-related liabilities and crimes. However, she continued to serve on the Board of Purdue.

52. Ilene Sackler Lefcourt is the direct or indirect beneficiary of 7.14% of the profits earned by Purdue and the Purdue-related entities from the sale of opioids.

53. At all relevant times, Beverly Sackler served as a trustee of one or more trusts that beneficially own and control Purdue and the Purdue-related Additional Defendants and to which 50% of the profits of Purdue and the Purdue-related Additional Defendants from the sale of opioids has been conveyed. She has also served as a member of the board of directors of Purdue and Purdue-related entities since the 1990s. Beverly Sackler is the direct or indirect beneficiary of some portion of 50% of the profits earned by Purdue and the Purdue-related business entities from the sale of opioids.

54. Theresa Sackler is the direct or indirect beneficiary of 50% of the profits earned by Purdue and the Purdue-related Additional Defendants from the sale of opioids. She also has served as a member of the board of directors of Purdue and Purdue-related business entities since the 1990s.

55. David A. Sackler is the direct or indirect beneficiary of some portion of 25% of the profits earned by Purdue and the Purdue-related business entities from the sale of opioids. He has also served as a member of the board of directors of Purdue and Purdue-related entities since 2012.

56. The Sackler Family Defendants, the Sackler Families, and the Richard Sackler Trust, are the sole beneficial owners of Purdue and its associated companies and the Purdue-related

business entities. All of Purdue's and its associated companies' profits go to family trusts and business entities dominated and controlled by Sackler Family Defendants.

57. Richard Sackler, Jonathan Sackler, Mortimer D.A. Sackler, Kathe Sackler, Ilene Sackler Lefcourt, Beverly Sackler, Theresa Sackler, David Sackler, Rhodes Tech, Rhodes Tech Inc., Rhodes Pharma, Rhodes Pharma Inc., the Raymond Sackler Trust (through its trustees), and P.F. Labs, each knowingly aided, abetted, participated in, and benefitted from the wrongdoing of Purdue as alleged in the Amended Complaint.

<u>The Sacklers and the Integration of Advertising and Medicine</u>

58. Before the defendants in this action began their marketing campaign for prescription opioids, generally accepted standards of medical practice dictated that opioids should only be used short-term, for instance, for acute pain, pain relating to recovery from surgery, or for cancer or palliative care. In those instances, the risks of addiction are low or of little significance. The commercial success of prescription opioids thus would not have been possible without a fundamental shift in prescribers' perception of the risks and benefits of long-term opioid use.

59. As it turned out, Purdue was uniquely positioned to execute just such a maneuver, thanks to the legacy of Arthur Sackler, the (now-deceased) brother of Raymond and Mortimer Sackler.

60. Arthur Sackler created the pharmaceutical advertising industry as we know it—laying the groundwork for the OxyContin promotion that would make the Sacklers billionaires.

61. Arthur Sackler, a psychiatrist turned "ad man," was both a psychiatrist and a marketing executive, and, by many accounts, a brilliant and driven man. He pursued two careers simultaneously, as a psychiatrist at Creedmoor State Hospital in New York and the president of an advertising agency called William Douglas McAdams. Arthur pioneered both print advertising in

medical journals and promotion through physician “education” in the form of seminars and continuing medical education courses. He understood the persuasive power of recommendations from fellow physicians, and did not hesitate to manipulate information when necessary. For example, one promotional brochure produced by his firm for Pfizer showed business cards of physicians from various cities as if they were testimonials for the drug, but when a journalist tried to contact these doctors, he discovered that they did not exist.

62. Arthur Sackler revolutionized medical marketing in the 1950’s and 60’s by creating the very marketing ploys his family later used to perpetuate the massive fraud alleged in this action. In striving to make Pfizer (with its blockbuster drug, valium) a household name among physicians, Arthur Sackler recognized that “selling new drugs requires a seduction of not just the patient but the doctor who writes the prescription,” and he maximized influence over physician prescribing by developing the following marketing ploys to disseminate pharmaceutical messaging to the masses under the guise of science and truth: a. contacting prescribers directly with a variety of perks, benefits and even job offers; b. publishing seemingly neutral articles in medical journals, citing scientific studies (frequently underwritten by the pharmaceutical companies whose products he was marketing); c. marketing illnesses (i.e., lamenting and marketing the under treatment of purported illnesses and the corresponding under-utilization of drugs he was promoting); d. paying prominent physicians to endorse his products; and e. funding continuing medical education programs (“CME’s”), controlling the messaging of key opinion leaders, and maximizing influence over physician prescribing practices.

63. In the 1960s, Arthur Sackler made Valium into the first hundred0-milliondollar drug, so popular it became known as “Mother’s Little Helper.” His expertise as a psychiatrist was one of the keys to his success. When Arthur’s client, Roche, developed Valium, it already had a

similar drug, Librium, another benzodiazepine, on the market for treatment of anxiety. So Arthur invented a condition he called "psychic tension"— essentially stress—and pitched Valium as the solution. The campaign, for which Arthur was compensated based on volume of pills sold, was a remarkable success.

64. In marketing tranquilizers Librium and Valium, Arthur Sackler broadened his customer base to potentially include everyone. For example, one campaign encouraged doctors to prescribe Valium to people with no psychiatric symptoms whatsoever, urging doctors to "consider the usefulness of Valium" in patients with no demonstrable pathology. Such marketing led one physician, writing in the journal Psychosomatics in 1965, to ask, "When do we not use this drug?'"

65. As the line between medical education and medical marketing became very deliberately blurred, Valium became the pharmaceutical industry's first hundred-million-dollar, and then billion-dollar, drug. For his design and creation of these medical marketing strategies, he was posthumously inducted into the Medical Advertising Hall of Fame, but as succinctly put by Allen Frances, the former chair of psychiatry at Duke University School of Medicine: "'Most of the questionable practices that propelled the pharmaceutical industry into the scourge it is today can be attributed to Arthur Sackler.'"

66. In other precursors of the current crisis, Arthur Sackler promoted these drugs despite the lack of any studies of their addictive potential. Additionally, he started his own newspaper, the Medical Tribune, despite concerns that a pharmaceutical advertiser should not be publishing a medical periodical directed at doctors. He paid Key Opinion Leaders ("KOLs"), including for example, Henry Welch (then chief of FDA's antibiotics division), almost $300,000 in exchange for his help in promoting pharmaceutical drugs. By the 1970's, doctors were prescribing more than 100 million tranquilizer prescriptions annually, creating what Sen. Edward

Kennedy called "'a nightmare of dependence and addiction.'"

The Sackler Families and the Development of OxyContin

67. The Sackler brothers—Arthur, Mortimer, and Raymond—purchased a small patent-medicine company called the Purdue Frederick Company ("PF Co.") in 1952.

68. PF Co. had been formed in 1892 by Dr. John Purdue Gray and George Frederick Bingham and incorporated in New York on June 29, 1911.

69. After Arthur's death, Mortimer and Raymond bought out his share. Since that time PF Co. and its associated companies have all been owned by the Raymond Sackler Family and the Mortimer Sackler Family.

70. PF Co. is no longer an active New York corporation, having been merged into PF Labs on May 7, 2004.

71. At all relevant times, PF Co. and PF Labs have been beneficially owned by the Sackler Families and controlled by them through Defendant Sackler Family members.

72. After the Sackler brothers acquired PF Co. in 1952, they sold products ranging from earwax remover to antiseptic, and it became a profitable business. As an advertising executive, Arthur was not involved, on paper at least, in running the family business because that would have been a conflict of interest. Raymond became the head executive of the family's US business while Mortimer ran the UK side of the business.

73. Beginning in the 1980s PF Co. and its associated companies engaged in the business of designing, testing, manufacturing, labeling, advertising, promoting, marketing, selling or distributing opioids throughout the United States.

74. In the 1980s, the Sackler Families, through a UK affiliate, acquired a Scottish drug producer that had developed a sustained-release technology suitable for morphine. PF Co.

marketed this extended-release morphine as MS Contin. It quickly became the Sackler Families' best seller. As the patent expiration for MS Contin loomed, the Sackler Families searched for a drug to replace it. Around that time, Richard Sackler had become more involved in the management of the families' businesses. Richard had grand ambitions for the family business; according to a long-time Purdue sales representative, "Richard really wanted Purdue to be big—I mean really big." Richard believed Purdue should develop another use for its "Contin" timed-release system.

75. In 1990, Purdue's VP of clinical research, Robert Kaiko, sent a memo to Richard and other executives recommending that the company work on a pill containing oxycodone. At the time, oxycodone was perceived as less potent than morphine, largely because it was most commonly prescribed as Percocet, the relatively weak oxycodone-acetaminophen combination pill, or Percodan, where it was blended with aspirin. By contrast, the oxycodone pill developed by Purdue – OxyContin -- was pure oxycodone in a time-release formula similar to MS Contin, and it was more potent than morphine. Purdue also decided to produce pills with as much as 160 milligrams of oxycodone, far in excess of any other prescription opioid.

76. OxyContin was created by PF Co., but responsibility for designing, testing, manufacturing, labeling, advertising, promoting, marketing, selling, and distributing OxyContin and other opioid products was shared among PF Co., Purdue, PF Labs, and other Purdue-related companies.

77. At relevant times, OxyContin was manufactured by PF Labs.

78. MS Contin had always been limited by the stigma associated with morphine. Oxycodone did not have that problem, and what is more, it was sometimes mistakenly called "oxycodeine," which also contributed to a false perception of relatively lower potency, because

codeine is weaker than morphine. Purdue acknowledged using this false perception to its advantage when it eventually pled guilty to criminal charges of "misbranding" in 2007, admitting that it was "well aware of the incorrect view held by many physicians that oxycodone was weaker than morphine" and "did not want to do anything 'to make physicians think that oxycodone was stronger or equal to morphine' or to 'take any steps . . . that would affect the unique position that OxyContin'" held among physicians.

79. Even though oxycodone did not have the same stigma as morphine, in focus groups conducted before OxyContin's release, Purdue learned that doctors were concerned about the abuse potential of opioids. The focus group concluded that the perceived abuse potential of opioids was the "'biggest negative' that might prevent widespread use of the drug." For Purdue and OxyContin to be "really big," Purdue needed to both distance its new product from the traditional view of narcotic addiction risk, and broaden the drug's uses beyond cancer pain and hospice care. A marketing memo sent to Purdue's top sales executives in March 1995 recommended that if Purdue could show that the risk of abuse was lower with OxyContin than with traditional immediate-release narcotics, sales would increase. As discussed below, Purdue did not find or generate any such evidence, but this did not stop Purdue from making that claim regardless.

80. Despite the fact that there has been little or no change in the amount of pain reported in the U.S. over the last twenty years, Purdue recognized an enormous untapped market for its new drug. As Dr. David Haddox, a Senior Medical Director at Purdue, declared on the Early Show, a CBS morning talk program, "There are 50 million patients in this country who have chronic pain that's not being managed appropriately every single day. OxyContin is one of the choices that doctors have available to them to treat that."

81. Purdue, PF Co., PF Labs, and the Sackler Families launched OxyContin with one

of the biggest pharmaceutical marketing campaigns in history, deploying many persuasive techniques pioneered by Arthur. They trained and armed a force of approximately 1,000 sales representatives with charts showing OxyContin's purported benefits. A major thrust of the sales campaign was that OxyContin should be prescribed not merely for the kind of severe short-term pain associated with surgery or for cancer pain but also for less acute, longer-lasting pain, such as arthritis, back pain, sports injuries, fibromyalgia. The number of conditions that OxyContin could treat was, according to defendants, unlimited.

82. The training included "training in 'overcoming objections' from clinicians." "If a doctor inquired about addiction," the representative was instructed to respond thus: '"The delivery system is believed to reduce the abuse liability of the drug.'" Another sales representative said that Purdue executives "told us to say things like: "it is 'virtually' non-addicting."

83. Purdue sales representatives were provided with studies and literature provided by other physicians. Purdue had a speakers' bureau through which it paid several thousand doctors to attend medical conferences and deliver presentations about OxyContin's merits. "Doctors were offered all-expenses-paid trips to pain-management seminars in places like Boca Raton." Internal documents reflect that doctors who attended these seminars wrote OxyContin prescriptions more than twice as often as those who didn't.

84. Purdue also advertised in medical journals and produced promotional videos featuring not just satisfied patients but also doctor's testimonials. "The marketing of OxyContin relied on an empirical circularity: the company convinced doctors of the drug's safety with literature that had been produced by doctors who were paid, or funded, by the company." According to a former OxyContin sales representative, Richard Sackler was "'the dude that made it happen.'" Richard Sackler himself was tireless in his dedication to OxyContin's success. When

benefit plans began citing OxyContin abuse as an excuse not to pay, Richard Sackler sent an email to sales representatives stating that, for insurers, "'addiction' may be a convenient way to just say 'NO.'"

85. Members of the Sackler family were daily on site at Purdue's headquarters, controlling the management of their family business and all of its employees.

86. Richard Sackler is named as inventor on some 50 patents relating to oxycodone and other pain medications, including several patents apparently issued as late as 2016. Virtually all such patents invented by Richard Sackler were assigned to Purdue.

87. In 1997, both Richard and Kathe Sackler were part of a conspiracy to deceive physicians into believing that oxycodone was half as strong as morphine, when in fact the opposite was true; this deception was known by Purdue to ease the fears of well-meaning and careful physicians about prescribing OxyContin for non-cancer pain uses.

88. In the late 1990s Richard, Jonathan and Kathe Sackler participated in an unlawful attempt to deceive European drug regulators into classifying OxyContin as totally uncontrolled, i.e., capable of being obtained without a prescription, despite the fact that all of these family members were by then well aware of the abuse liability of the drug in the U.S.

89. In 2001, Kathe Sackler attended a talk given by the chief medical officer of Sikorsky Aircraft, in which the speaker expressed grave concern about the risks associated with OxyContin; instead of acknowledging this fact to the medical officer, Kathe Sackler instead remained silent and returned to the Purdue headquarters, where employees were directed to find ways to undercut and deflect the Sikorsky medical officer's concerns.

90. In the period around 1999-2003, Purdue developed a method to cause company emails to self-destruct at a pre-determined time; this was an attempt to create a system where

potentially incriminating documents would automatically self-destruct, even after receipt by unrelated third-parties. Richard, Jonathan and Kathe Sackler all were directly aware and supportive of this project.

<u>Members of the Sackler Families Were Aware of Risks Associated With OxyContin No Later Than the Summer of 1999</u>

91. That prescription opioids would lead to addiction, and specifically that OxyContin could be, and was being, abused has been known to Purdue and to the members of the Sackler Families involved in running the family business since at least the summer of 1999.

92. In summer of 1999, a Purdue sales representative wrote to the President of Purdue reporting widespread abuse of OxyContin. As a result of that memo, a secretary at Purdue, Maureen Sara, was tasked with doing research on the Internet to learn about the nature and scope of the abuse, specifically to learn about how recreational drug users were misusing OxyContin.

93. In order to carry out her assignment, Ms. Sara began visiting drug-user Internet "news groups" or "chat rooms" on a daily basis. Two groups in particular that Ms. Sara visited were 'alt.drugs' and 'alt.drugs.hard'. For a period of time, from late-summer and early fall of 1999, Ms. Sara would forward screen shots from these news groups on a daily basis to Howard Udell, then General Counsel of Purdue.

94. In October or November, 1999, Ms. Sara prepared a memo summarizing her research into misuse of OxyContin. The memo described how users would remove the coating on the OxyContin pills, crush them, cook them, and snort or shoot them. Ms. Sara sent the memo containing the details of OxyContin abuse by drug users not only to the President of Purdue and to its General Counsel, but also to Purdue's then-medical director, and directly to members of the Sackler Families involved in the management of the company, including Richard Sackler, Jonathan Sackler, and Kathe Sackler.

95. Purdue, Richard Sackler, Jonathan Sackler, and Kathe Sackler were thus all aware of the risk and abuse potential and reality of OxyContin long before Purdue acknowledged the same to government, the healthcare community or the public. In sworn testimony before the U.S. House of Representatives in 2001, Purdue President Michael Friedman, in the presence of Purdue General Counsel Howard R. Udell, swore that the first the companies knew of widespread abuse of OxyContin was in the year 2000. This was, of course, patently inconsistent with what the members of the Sackler Families knew from the Sara memo they had received in 1999. No member of the Sackler Families at any time tried to correct the false narrative promulgated far and wide about the abuse liability of OxyContin, nor corrected the false statement about when Purdue became aware of this problem with the drug.

96. Richard Sackler, Kathe Sackler, Jonathan Sackler, Theresa Sackler, Mortimer D.A. Sackler, and Ilene Sackler have been aware since at least 1999 of potential liability for Purdue, and those acting in concert with Purdue, because of the addictive nature of OxyContin. With the intention of shielding from creditors the proceeds of their wrongdoing, they have stripped out of Purdue and the Purdue-related Additional Defendants each and every year hundreds of millions of dollars of profits from the sales of OxyContin and other opioid-containing medications, including a generic form of OxyContin sold by Rhodes Pharma. On information and belief, all such transfers were made at a time when Purdue was insolvent, or such transfers caused or increased Purdue's insolvency; all such transfers unjustly enriched the recipients; and all such transferred funds are recoverable from the Sackler Defendants in favor of Plaintiff.

<u>Purdue-Related Business Entities Continued to Oversee Purdue's Wrongdoing Even after Purdue Was Fined and Warned about Its Conduct</u>

97. From 2001 to 2007, Purdue was investigated by 26 states and the U.S. Department of Justice. Beginning in or about 2003, advised by Baker, who served as legal counsel to the entire

Purdue organization and the Sackler Families, all of the Sacklers who served as executive officers of Purdue resigned out of concern that they might be held personally liable for conduct on behalf of Purdue in which they had previously engaged and in which they expected and intended to continue to engage after their respective resignations.

98. In 2007, PFC agreed to pay nearly $700 million and pleaded guilty to a felony for misleading doctors and patients about opioids. Purdue admitted that its supervisors and employees, "with the intent to defraud or mislead, marketed and promoted OxyContin as less addictive, less subject to abuse and diversion, and less likely to cause tolerance and withdrawal than other pain medications."

99. In 2008, more Americans died from opioid overdoses than ever before.

100. In 2009, the American Journal of Public Health published an article about Purdue's opioid marketing entitled, "The Promotion and Marketing of OxyContin: Commercial Triumph, Public Health Tragedy." The article detailed Purdue's use of sales representatives, targeting of high-prescribers, and deception about addiction. That same year, CDC reported that deaths from opioids had recently tripled. In 2010, Time magazine published a story about Purdue's opioids entitled, "The New Drug Crisis: Addiction by Prescription." Overdoses were the leading cause of accidental death in 15 states. By the spring of 2010, Purdue's directors had been told that Purdue could not get product liability insurance to cover OxyContin.

101. In 2011, the White House announced that prescription drug abuse was the nation's fastest-growing drug problem and called for "educating healthcare providers about prescription drug abuse … so they will not over-prescribe[.]" The CDC announced that prescription opioid overdoses had reached epidemic levels and called out Purdue's opioids by name. That same year, Fortune magazine interviewed Purdue executives, including Vice President Alan Must. Fortune

published a story about Purdue, the Sackler Families, and evidence that they profited from opioid addiction. Mr. Must admitted that Purdue was "well aware" of concerns about its conduct: "We are well aware of detractors. For those individuals who think we're evil … I don't think there's anything we can do that is going to change their opinion."

102. In 2012, the U.S. Senate launched an investigation into whether Purdue was deceiving doctors and patients about opioids. In a letter to the CEO of Purdue, the Senators warned of "an epidemic of accidental deaths and addiction resulting from the increased sale and use of powerful narcotic painkillers." The Senate letter warned Purdue specifically of the danger of patients taking higher doses: "over the last decade, the number of prescriptions for the strongest opioids has increased nearly fourfold, with only limited evidence of their long-term effectiveness or risks while data suggest that hundreds of thousands of patients nationwide may be on potentially dangerous doses." The Senate letter also warned about Purdue misleading doctors and patients: "There is growing evidence pharmaceutical companies that manufacture and market opioids may be responsible, at least in part, for this epidemic by promoting misleading information about the drugs' safety and effectiveness." The Senate put the directors on notice that they were under scrutiny, demanding that Purdue produce to investigators a set of "presentations, reports, and communications to Purdue's management team or board of directors from 2007 to the present."

103. In 2013, the Los Angeles Times revealed that Purdue had been compiling a list for the past decade of 1,800 doctors suspected of recklessly prescribing its opioids, but Purdue had reported only 8% of them to authorities. Purdue attorney Robin Abrams gave multiple interviews to the newspaper. Abrams was a Vice President of Purdue, and she signed Purdue's 2007 settlement agreement. In 2013, she admitted that Purdue had the list, and said Purdue would not agree to disclose it to authorities because, "I don't really want to open up an opportunity for folks

come in here and start looking and second-guessing."

104. In 2014, Edward Mahony, the Executive Vice President, CFO, and Treasurer of Purdue stated that the Kentucky lawsuit was so significant that it could jeopardize "Purdue's long-term viability." That same year, the Governor of Massachusetts declared the opioid crisis a public health emergency.

105. In 2016, the CDC published the CDC Guideline for Prescribing Opioids for Chronic Pain to try to stop dangerous opioid prescribing.

106. In 2017, the President of the United States declared the opioid crisis a national public health emergency.

107. The Sackler Family Defendants oversaw Purdue's scheme to send sales representatives to visit doctors thousands of times. They oversaw Purdue's scheme to hire top prescribers to promote its opioids. They oversaw Purdue's effort to get more patients on higher doses of opioids for longer periods. They were aware of, allowed and directed the content of the messages conveyed in Purdue's marketing.

108. Richard Sackler testified that the sales representatives were the main way that Purdue promoted its opioids. He testified that the key to getting doctors to prescribe and keep prescribing Purdue opioids was regular visits from the sales force. The board tracked the exact number of sales representatives and the exact number of visits they made to urge doctors to prescribe Purdue opioids. The board knew which drugs were promoted; how many visits sales representatives averaged per workday; how much each visit cost Purdue; and the company's plan for sales visits in each upcoming quarter. The Board approved specific plans to hire new sales representatives, hire and promote new District and Regional managers, and create sales "territories" in which representatives would target doctors.

Project Tango

109. In September 2014, Kathe Sackler dialed in to a confidential call about *Project Tango*. *Project Tango* was a secret plan for Purdue to expand into the business of selling drugs to treat opioid addiction. In their internal documents, Kathe and staff wrote down what Purdue publicly denied for decades: that addictive opioids and opioid addiction are "naturally linked." They determined that Purdue should expand across "the pain and addiction spectrum," to become "an end-to-end pain provider." Purdue illustrated the end-to-end business model with a picture of a dark hole labeled "Pain treatment" that a patient could fall into — and "Opioid addiction treatment" waiting at the bottom.




*Purdue's secret "Project Tango"* [534]

Kathe Sackler and the *Project Tango* team reviewed their findings that the "market" of people addicted to opioids, measured coldly in billions of dollars, had doubled from 2009 to 2014.




*Purdue's measure of the opioid addiction "market"*

Kathe and the staff found that the catastrophe provided an excellent compound annual growth rate ("CAGR"): "Opioid addiction (other than heroin) has grown by ~20% CAGR from 2000 to 2010."[535]

Kathe Sackler and the staff revealed in their internal documents that Purdue's tactic of blaming addiction on untrustworthy patients was a lie. Instead, the truth is that opioid addiction can happen to anyone who is prescribed opioids:

> ▪ "This can happen to any-one – from a 50 year old woman with chronic lower back pain to a 18 year old boy with a sports injury, from the very wealthy to the very poor"

*Purdue's "Project Tango" patient and clinical rationale*

110. Kathe and the staff concluded that millions of people who became addicted to opioids were the Sacklers' next business opportunity. Staff wrote: "It is an attractive market. Large unmet needs by for vulnerable, underserved and stigmatized patient population suffering from substance abuse dependence and addiction." The team identified eight ways that Purdue's experience getting patients *on* opioids could now be used to sell treatment for opioid addiction.

111. Kathe Sackler instructed staff that *Project Tango* required their "immediate attention." She pressed staff to look into reports of children requiring hospitalization after swallowing buprenorphine — the active ingredient in both Purdue's Butrans opioid and the opioid addiction treatment that the Sacklers wanted to sell, through *Project Tango*, in a film that melts in your mouth.[537] Staff assured Kathe that children were overdosing on pills, not films, which is a positive for *Tango*."

112. In February 2015, staff presented Kathe Sackler's work on *Project Tango* to the Board. The plan was for a Joint Venture controlled by the Sacklers to sell the addictionmedication suboxone.

113. Kathe Sackler and the staff revealed in their internal documents that Purdue's tactic of blaming addiction on untrustworthy patients was a lie. Instead, the truth is that opioid addiction can happen to anyone who is prescribed opioids:

*Purdue's "Project Tango" patient and clinical rationale*

114. Kathe and the staff concluded that millions of people who became addicted to

opioids were the Sacklers' next business opportunity. Staff wrote: "It is an attractive market. Large unmet need for vulnerable, underserved and stigmatized patient population suffering from substance abuse, dependence and addiction." The team identified eight ways that Purdue's experience getting patients *on* opioids could now be used to sell treatment for opioid addiction.

115. Kathe Sackler instructed staff that *Project Tango* required their "immediate attention." She pressed staff to look into reports of children requiring hospitalization after swallowing buprenorphine — the active ingredient in both Purdue's Butrans opioid and the opioid addiction treatment that the Sacklers wanted to sell, through *Project Tango*, in a film that melts in your mouth.[537] Staff assured Kathe that children were overdosing on pills, not films, "which is a positive for *Tango*."

116. In February 2015, staff presented Kathe Sackler's work on *Project Tango* to the Board. The plan was for a Joint Venture controlled by the Sacklers to sell the addiction medication suboxone.

117. The *Tango* team mapped how patients could get addicted to opioids through prescription opioid analgesics such as Purdue's OxyContin or heroin, and then become consumers of the new company's suboxone. The team noted the opportunity to capture customers: even after patients were done buying suboxone the first time, 40-60% would relapse and need it again.[540]




*Purdue presentation explaining "Project Tango" patient flow*

118. The next month, *Project Tango* came to an end. Kathe, David, Jonathan, and Mortimer Sackler discussed the discontinuation of the project at their Business Development Committee meeting. But the Sackler's efforts to sell addictive opioids continued.

<u>The Retail Chain Pharmacies Failed to Control the Supply Chain and Prevent Diversion</u>

119. The Retail Chain Pharmacies earned enormous profits by flooding the country with prescription opioids. The Retail Chain Pharmacies are all engaged in the business of selling opioids at retail. The failure of the Retail Chain Pharmacies to effectively monitor and report suspicious orders of prescription opioids at the retail level and to implement measures to prevent diversion through improper prescriptions greatly contributed to the vast increase in opioid overdose and addiction.

120. The Retail Chain Pharmacies' conduct directly caused a public health and law-enforcement crisis across this country, including in Louisiana. The Retail Chain Pharmacies Have a Duty to Prevent Diversion 150. Each of the Retail Chain Pharmacies does substantial business throughout the United States, including Louisiana. This business includes the distribution and

retail sales of prescription opioids.

121. The Retail Chain Pharmacies distributed and sold at retail substantial quantities of prescription opioids, including fentanyl, hydrocodone, and oxycodone in Louisiana. In addition, they distributed and sold at retail substantial quantities of prescription opioids in other states, and these drugs were diverted from these other states to Louisiana. The Retail Chain Pharmacies failed to take meaningful action to stop this diversion despite their knowledge of it, and contributed substantially to the diversion problem.

122. Each participant in the supply chain of opioid distribution, including the Retail Chain Pharmacies, is responsible for preventing diversion of prescription opioids into the illegal market by, among other things, monitoring, and reporting suspicious activity.

123. As sellers of substances known to be dangerous and addictive, the Retail Chain Pharmacies owe a common law duty to act with care in selling at retail these dangerous drugs. In particular, because the risks to public health of uncontrolled distribution of these substances are well-known, the Retail Chain Pharmacies are obliged to use reasonable care to prevent diversion of dangerous drugs.

124. Defendants' common-law duties parallel their obligations under state and federal law, which inform, and provide the standard of care for, these common law duties. The Retail Chain Pharmacies, like manufacturers and wholesale distributors, are registrants under the federal Controlled Substances Act ("CSA"), 21 C.F.R. § 1301.11. Under the CSA, pharmacy registrants are required to "provide effective controls and procedures to guard against theft and diversion of controlled substances." See 21 C.F.R. § 1301.71(a). In addition, 21 C.F.R. § 1306.04(a) states, "[t]he responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the

prescription." Because pharmacies themselves are registrants under the CSA, the duty to prevent diversion lies with the pharmacy entity, not the individual pharmacist alone.

125. Under Louisiana law, moreover, pharmacies are responsible for filling and dispensing only prescriptions for legitimate medical purposes, and this responsibility is equal to the responsibility of prescribers to only prescribe controlled substances for legitimate medical purposes. Persons operating pharmacies and supervising pharmacists are not relieved of their responsibility to detect and correct any diversion or mishandling of controlled substances by a delegation of responsibility.

126. Pharmacists are required to make a good faith effort to verify the identity of any person accepting delivery of a controlled substance "by requiring such person, if unknown to the pharmacy, to present appropriate identification."

127. The DEA, among others, has provided extensive guidance to pharmacies concerning their duties to the public. The guidance advises pharmacies how to identify suspicious orders and other evidence of diversion.

128. Suspicious pharmacy orders include orders of unusually large size, orders that are disproportionately large in comparison to the population of a community served by the pharmacy, orders that deviate from a normal pattern and/or orders of unusual frequency and duration, among others.

129. Additional types of suspicious orders include: (1) prescriptions written by a doctor who writes significantly more prescriptions (or in larger quantities or higher doses) for controlled substances compared to other practitioners in the area; (2) prescriptions which should last for a month in legitimate use, but are being refilled on a shorter basis; (3) prescriptions for antagonistic drugs, such as depressants and stimulants, at the same time; (4) prescriptions that look "too good"

or where the prescriber's handwriting is too legible; (5) prescriptions with quantities or doses that differ from usual medical usage; (6) prescriptions that do not comply with standard abbreviations and/or contain no abbreviations; (7) photocopied prescriptions; or (8) prescriptions containing different handwriting. Most of the time, these attributes are not difficult to detect and should be easily recognizable by pharmacies.

130. Suspicious pharmacy orders are red flags for if not direct evidence of diversion.

131. Other signs of diversion can be observed through data gathered, consolidated, and analyzed by the Retail Chain Pharmacies themselves. That data allows them to observe patterns or instances of dispensing that are potentially suspicious, of oversupply in particular stores or geographic areas, or of prescribers or facilities that seem to engage in improper prescribing.

132. According to industry standards, if a pharmacy finds evidence of prescription diversion, the local Board of Pharmacy and DEA must be contacted. (2) The Retail Chain <u>Pharmacies Failed to Perform Their Duties</u>

133. Despite their legal obligations, the Retail Chain Pharmacies failed to meet their obligations and allowed widespread diversion to occur—and they did so knowingly.

134. The Retail Chain Pharmacies' failure to adequately train their pharmacists and pharmacy technicians on how to properly and adequately handle prescriptions for opioid painkillers, including what constitutes a proper inquiry into whether a prescription is legitimate, whether a prescription is likely for a condition for which the FDA has approved treatments with opioids, and what measures and/or actions to take when a prescription is identified as phony, false, forged, or otherwise illegal, or when suspicious circumstances are present, including when prescriptions are procured and pills supplied for the purpose of illegal diversion and drug trafficking.

135. The Retail Chain Pharmacies also failed to adequately use data available to them to identify doctors who were writing suspicious numbers of prescriptions and/or prescriptions of suspicious amounts of opioids, or to adequately use data available to them to do statistical analysis to prevent the filling of prescriptions that were illegally diverted or otherwise contributed to the opioid crisis. The Retail Chain Pharmacies failed to analyze: (a) the number of opioid prescriptions filled by individual pharmacies relative to the population of the pharmacy's community; (b) the increase in opioid sales relative to past years; (c) the number of opioid prescriptions filled relative to other drugs; and (d) the increase in annual opioid sales relative to the increase in annual sales of other drugs.

136. The Retail Chain Pharmacies also failed to conduct adequate internal or external audits of their opioid sales to identify patterns regarding prescriptions that should not have been filled and to create policies accordingly, or if they conducted such audits, they failed to take any meaningful action as a result.

137. The Retail Chain Pharmacies were, or should have been, fully aware that the quantity of opioids being distributed and dispensed by them was untenable, and in many areas patently absurd; yet, they did not take meaningful action to investigate or to ensure that they were complying with their duties and obligations under the law with regard to controlled substances. (3) The Retail Chain Pharmacies were on notice of and contributed to illegal diversion of prescription opioids.

138. The Retail Chain Pharmacies were keenly aware of the oversupply of prescription opioids through the extensive data and information they developed and maintained as both distributors and retail sellers. Yet, instead of taking any meaningful action to stem the flow of opioids into communities and prevent diversion, they continued to participate in the oversupply

and profit from it.

139. The Retail Chain Pharmacies developed and maintained extensive data on opioids they distributed and sold in their retail stores. Through this data, Retail Chain Pharmacies had direct knowledge of patterns and instances of improper distribution, prescribing, and use of prescription opioids in communities throughout the Country and, in particular, Louisiana. They used the data to evaluate their own sales activities and workforce. The Retail Chain Pharmacies also provided other defendants with data regarding, inter alia, individual doctors in exchange for rebates or other forms of consideration. The Retail Chain Pharmacies' data is a valuable resource that they could have used to help stop diversion, but failed to do so.

Retail Chain Pharmacies' Policy of Speed over Accuracy was Negligent

140. Performance metrics and prescription quotas adopted by the Retail Chain Pharmacies for their retail stores contributed to their failure to perform their duties.

141. The performance metric systems rate the pharmacist employees at the stores operated by Retail Chain Pharmacies based solely on productivity. These requirements placed significant and unrealistic time pressures on the pharmacists.

142. The Retail Chain Pharmacies measure how many and how quickly prescriptions are filled daily based on store volume. Many of the Retail Chain Pharmacies' locations require pharmacists to fill one prescription every three minutes. The programs may also measure how many telephone calls are made to customers to refill and/or pick up prescriptions; how many flu shots are given; as well as other pharmacy tasks. All measurements focused upon productivity with the end goal of maximizing retail defendants' profits.

143. In addition to the pharmacist's other duties, Retail Chain Pharmacies required their employee pharmacists to fill more than 600 prescriptions per work shift. For example, CVS

maintains a “Metrics System” to evaluate performance in its pharmacists. Under CVS’s Metrics System, pharmacists are directed to meet high goals that make it difficult, if not impossible, to comply with applicable laws and regulations. There is no measurement for pharmacy accuracy or customer safety. Moreover, the bonuses for pharmacists are calculated, in part, on how many prescriptions that pharmacist fills within a year or, similarly, on how many prescriptions that pharmacists are able to fill within a year.

144. At the same time that Retail Chain Pharmacies increased demands for productivity, they cut the hours of pharmacy technicians, leaving pharmacists severely understaffed and unable to provide all necessary services.

145. Retail Chain Pharmacies’ high-volume and increased-profits business model led to a greater number of errors in dispensing prescriptions, which can result in substantial harm to pharmacy customers.

146. A survey conducted by the Institute for Safe Medication Practices (“ISMP”) of 673 pharmacists revealed that 83% believed that distractions due to performance metrics or measured wait times contributed to dispensing errors, and that 49% felt specific time measurements were a significant contributing factor.

147. Further, the National Association of Boards of Pharmacy found that performance metrics, which measure the speed and efficiency of prescription work flow—using such parameters as prescription wait times, percentage of prescriptions filled within a specified time period, number of prescriptions verified, and number of immunizations given per pharmacist shift—may distract pharmacists and impair professional judgment.

148. The practices of applying performance metrics or quotas to pharmacists in the practice of pharmacy may cause distractions that could potentially decrease pharmacists’ ability

to perform drug utilization review, interact with patients, and maintain attention to detail, which could ultimately lead to unsafe conditions at a pharmacy.

149. The Retail Chain Pharmacies productivity policies are directly at odds with their performance of due diligence obligations required to be performed in conjunction with federal and state law, especially given the higher duty of care associated with the prescription of narcotic opioids.

150. The Retail Chain Pharmacies were negligent in failing to ensure, or even permit, pharmacists in their stores to exercise the reasonable care necessary under the circumstances to detect and prevent diversion.

151. The Retail Chain Pharmacies Failed to Train Employees or Audit Data Regarding Opioid Diversion and Misuse.

152. The Retail Chain Pharmacies failed to adequately train their pharmacists and pharmacy techs on how to properly and adequately handle prescriptions for opioid painkillers, including what constitutes a proper inquiry into whether a prescription is legitimate, whether a prescription is likely for a condition for which the FDA has approved treatments with opioids, and what measures and/or actions to take when a prescription is identified as phone, false, forged, or otherwise illegal.

153. The Retail Chain Pharmacies failed to instruct their pharmacists and pharmacy techs on how to address situations in which they are forced to decline filling a prescription for a customer who submitted a prescription which a pharmacist has identified as suspicious.

154. The Retail Chain Pharmacies have failed to train their pharmacists and pharmacy techs on how to properly exercise their judgment with respect to determinations about whether a prescription is one that should be filled, or whether, under the law, the pharmacists should refuse

to fill it.

155. The Retail Chain Pharmacies failed to adequately use data available to them to identify doctors that were writing suspicious numbers of prescriptions and/or prescriptions of suspicious amounts of opioids.

156. The Retail Chain Pharmacies failed to adequately use data available to them to do statistical analysis to prevent the filling of prescriptions that contributed to the opioid crisis. The Retail Chain Pharmacies failed to analyze: (a) the number of opioid prescriptions filled by individual pharmacies relative to the population of the pharmacies relative to the population of the pharmacy's community; (b) the increase in opioid sales relative to past years; (c) the number of opioid prescriptions filled relative to other drugs; and (d) the increase in annual opioid sales relative to the increase in annual sales of other drugs.

157. The Retail Chain Pharmacies failed to conduct internal or external audits of their opioid sales to identify patterns regarding prescriptions that should not have been filled and to create policies accordingly. The Retail Chain Pharmacies failed to effectively respond to concerns raised by their own employees regarding inadequate policies and procedures regarding the filling of opioid prescriptions.

Multiple Enforcement Actions against the Retail Chain Pharmacies Confirms their Compliance Failures

158. The Retail Chain Pharmacies have long been on notice of their failure to abide by state and federal law and regulations governing the distribution and dispensing of prescription opioids. Indeed, several of the Retail Chain Pharmacies have been repeatedly penalized for their illegal prescription opioid practices. Based upon the widespread nature of these violations, these enforcement actions are the product of, and confirm, national policies and practices of the Retail Chain Pharmacies.

159. Numerous state and federal drug diversion prosecutions have occurred in which prescription opioid pills were procured from Retail Chain Pharmacies. The allegations in this Complaint do not attempt to identify all these prosecutions, and the information above is merely by way of example.

160. The litany of state and federal actions against the Retail Chain Pharmacies demonstrate that they routinely, and as a matter of standard operation procedure, violated their legal obligations that govern the distribution and dispensing of prescription opioids.

161. Throughout the country and in Louisiana in particular, the Retail Chain Pharmacies were or should have been aware of numerous red flags of potential suspicious activity and diversion.

162. From the vantage point of their retail pharmacy operations, the Retail Chain Pharmacies knew or reasonably should have known about the disproportionate flow of opioids into Louisiana and the operation of "pill mills" that generated opioid prescriptions that, by their quantity or nature, were red flags for if not direct evidence of illicit supply and diversion. Additional information was provided by news reports, and state and federal regulatory actions, including prosecutions of pill mills in the area.

163. The Retail Chain Pharmacies knew or reasonably should have known about the devastating consequences of the oversupply and diversion of prescription opioids, including spiking opioid overdose rates in Plaintiff's community.

164. Because of (among other sources of information) regulatory and other actions taken against the Retail Chain Pharmacies directly, actions taken against others pertaining to prescription opioids obtained from their retail stores, complaints and information from employees and other agents, and the massive volume of opioid prescription drug sale data that they developed and

monitored, the Retail Chain Pharmacies were well aware that their distribution and dispensing activities fell far short of legal requirements.

165. The Retail Chain Pharmacies ' actions and omission in failing to effectively prevent diversion and failing to monitor, report, and prevent suspicious orders have contributed significantly to the opioid crisis by enabling, and failing to prevent, the diversion of opioids.

166. CVS is one of the largest companies in the world, with annual revenue of more than $150 billion. According to news reports, it manages medications for nearly 90 million customers at 9,700 retail locations. It has 135 retail locations in Louisiana.

167. CVS is a repeat offender and recidivist: the company has paid fines totaling over $40 million as the result of a series of investigations by the DEA and the United States Department of Justice ("DOJ"). It nonetheless treated these fines as the cost of doing business and has allowed its pharmacies to continue dispensing opioids in quantities significantly higher than any plausible medical need would require, and to continue violating its recordkeeping and dispensing obligations under the CSA.

168. As recently as July 2017, CVS entered into a $5 million settlement with the U.S. Attorney's Office for the Eastern District of California regarding allegations that its pharmacies failed to keep and maintain accurate records of Schedule II, III, IV, and V controlled substances.

169. This fine was preceded by numerous others throughout the country. 203. In February 2016, CVS paid $8 million to settle allegations made by the DEA and the DOJ that, from 2008-2012, CVS stores and pharmacists in Maryland violated their duties under the CSA and filling prescriptions with no legitimate medical purpose.

170. In October 2016, CVS paid $600,000 to settle allegations by the DOJ that stores in Connecticut failed to maintain proper records in accordance with the CSA.

171. In September 2016, CVS entered into a $795,000 settlement with the Massachusetts Attorney General wherein CVS agreed to require pharmacy staff to access the state's prescription monitoring program website and review a patient's prescription history before dispensing certain opioid drugs.

172. In June 2016, CVS agreed to pay the DOJ $3.5 million to resolve allegations that 50 of its stores violated the CSA by filling forged prescriptions for controlled substances—mostly addictive painkillers—more than 500 times between 2011 and 2014.

173. In August 2015, CVS entered into a $450,000 settlement with the U.S. Attorney's Office for the District of Rhode Island to resolve allegations that several of its Rhode Island stores violated the CSA by filling invalid prescriptions and maintaining deficient records. The United States alleged that CVS retail pharmacies in Rhode Island filled a number of forged prescriptions with invalid DEA numbers, and filled multiple prescriptions written by psychiatric nurse practitioners for hydrocodone, despite the fact that these practitioners were not legally permitted to prescribe that drug. Additionally, the government alleged that CVS had recordkeeping deficiencies.

174. In May 2015, CVS agreed to pay a $22 million penalty following a DEA investigation that found that employees at two pharmacies in Sanford, Florida, had dispensed prescription opioids, "based on prescriptions that had not been issued for legitimate medical purposes by a health care provider acting in the usual course of professional practice. CVS also acknowledged that its retail pharmacies had a responsibility to dispense only those prescriptions that were issued based on legitimate medical need." In September 2014, CVS agreed to pay $1.9 million in civil penalties to resolve allegations it filled prescriptions written by a doctor whose controlled-substance registration had expired.

175. In August 2013, CVS was fined $350,000 by the Oklahoma Pharmacy Board for improperly selling prescription narcotics in at least five locations in the Oklahoma City metropolitan area.

176. Dating back to 2006, CVS retail pharmacies in Oklahoma and elsewhere intentionally violated the CSA by filling prescriptions signed by prescribers with invalid DEA registration numbers.

177. CVS has had knowledge and/or notice of the opioid problem since at least 2002.

178. At any time since CVS had knowledge and/or notice of the opioid problem it could have unilaterally taken steps to curtail and prevent expansion of the problem, but it failed to do so.

(b) Walgreens.

179. Walgreens is the second-largest pharmacy store chain in the United States behind CVS, with annual revenue of more than $118 billion. According to its website, Walgreens operates more than 8,100 retail locations and filled 990 million prescriptions on a 30-day adjusted basis in fiscal 2017.

180. Walgreens also has been penalized for serious and flagrant violations of the CSA. Indeed, Walgreens agreed to the largest settlement in DEA history—$80 million— to resolve allegations that it committed an unprecedented number of recordkeeping and dispensing violations of the CSA, including negligently allowing controlled substances such as oxycodone and other prescription opioids to be diverted for abuse and illegal black market sales.

181. The settlement resolved investigations into and allegations of CSA violations in Florida, New York, Michigan, and Colorado that resulted in the diversion of millions of opioids into illicit channels.

182. Walgreens' Florida operations at issue in this settlement highlight its egregious

conduct regarding diversion of prescription opioids. Walgreens' Florida pharmacies each allegedly ordered more than one million dosage units of oxycodone in 2011—more than ten times the average amount. 218. They increased their orders over time, in some cases as much as 600% in the space of just two years, including, for example, supplying a town of 3,000 with 285,800 orders of oxycodone in a one-month period. Yet Walgreens corporate officers turned a blind eye to these abuses. In fact, corporate attorneys at Walgreens suggested, in reviewing the legitimacy of prescriptions coming from pain clinics, that "if these are legitimate indicators of inappropriate prescriptions perhaps we should consider not documenting our own potential noncompliance," underscoring Walgreens' attitude that profit outweighed compliance with the CSA or the health of communities.

183. Defendant Walgreens' settlement with the DEA stemmed from the DEA's investigation into Walgreens' distribution center in Jupiter, Florida, which was responsible for significant opioid diversion in Florida. According to the Order to Show Cause, Defendant Walgreens' corporate headquarters pushed to increase the number of oxycodone sales to Walgreens' Florida pharmacies, and provided bonuses for pharmacy employees based on number of prescriptions filled at the pharmacy in an effort to increase oxycodone sales. In July 2010, Defendant Walgreens ranked all of its Florida stores by number of oxycodone prescriptions dispensed in June of that year, and found that the highest-ranking store in oxycodone sales sold almost 18 oxycodone prescriptions per day. All of these prescriptions were filled by the Jupiter Center.

184. Walgreens has also settled with a number of state attorneys general, including West Virginia ($575,000) and Massachusetts ($200,000).

185. The Massachusetts Attorney General's Medicaid Fraud Division found that, from

2010 through most of 2015, multiple Walgreens stores across the state failed to monitor the opioid use of some Medicaid patients who were considered high-risk.

186. In January 2017, an investigation by the Massachusetts Attorney General found that some Walgreens pharmacies failed to monitor patients' drug use patterns and didn't use sound professional judgment when dispensing opioids and other controlled substances—despite the context of soaring overdose deaths in Massachusetts. Walgreens agreed to pay $200,000 and follow certain procedures for dispensing opioids.

187. With approximately 4,600 stores in 31 states and the District of Columbia, including Louisiana, Rite Aid is the third-largest in the United States, with annual revenue of more than $21 billion. In 2009, as a result of a multi-jurisdictional investigation by the DOJ, Rite Aid and nine of its subsidiaries in eight states were fined $5 million in civil penalties for its violations of the CSA.

188. The investigation revealed that from 2004 onwards, Rite Aid pharmacies across the country had a pattern of non-compliance with the requirements of the CSA and federal regulations that lead to the diversion of prescription opioids in and around the communities of the Rite Aid pharmacies investigated. Rite Aid also failed to notify the DEA of losses of controlled substances in violation of 21 USC 842(a)(5) and 21 C.F.R 1301.76(b).

Opioids Diverted in One Location Migrate to Others

189. The Retail Chain Pharmacies' failure to control the supply chain and prevent diversion adversely affected communities throughout the United States. Once diverted opioids do not stay put; rather, diverted opioids move from areas of high supply to areas of high demand, traveling across state lines in a variety of ways.

190. First, prescriptions written in one state may, under some circumstances, be filled in

a different state. But even more significantly, individuals transported opioids from one jurisdiction specifically to sell them in another. When authorities in some states cracked down on opioid suppliers, suppliers in other states filled the gaps. Florida in particular assumed a prominent role, as its lack of regulatory oversight created a fertile ground for pill mills. Residents of other states would simply drive to Florida, stock up on pills from a pill mill, and transport them back to home to sell. The practice became so common that authorities dubbed these individuals "prescription tourists." Thus, once diverted into the illegal market in one location, prescription opioids could then flow freely into Louisiana and elsewhere. In particular, the I-95 corridor was one route by which diverted prescription opioids travelled from Florida northward to other states.

191. For this reason, the Retail Chain Pharmacies' negligence in failing to prevent in diversion in Florida, and throughout the United States, substantially contributed to the opioid crisis in Louisiana.

**COUNT XI: LOUISIANA REVOCATORY ACTION**

192. Plaintiff incorporates by reference all other paragraphs of this Complaint, as if fully set forth herein and further alleges as follows.

193. Plaintiff brings this count under the Louisiana Revocatory Action ("Revocatory Action"), Louisiana Civil Code arts. 2036, *et seq*.

194. On information and belief at all relevant times hereto, Purdue transferred assets to the Sackler Family at a time when Purdue was insolvent, or, when such transfers caused or increased Purdue's insolvency.

195. The Sackler Family is liable for all damages incurred by Plaintiff, and specifically the Sackler Family is liable for the return of all amounts received by it to the extentof Plaintiff's damages.

196. Any assets required to be returned by the Sackler Family to Purdue, inures first to the benefit of Plaintiff.

**COUNT V**
**FRAUD AND FRAUDULENT MISREPRESENTATION**
**(Against All Defendants)**

197. Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth here and further alleges as follows.

198. Under Louisiana law, “Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction.” La. Civ. Code Ann. Art. 1953. The “Revision Comments” to the said statute explain that “Fraud, like its French equivalent ‘*dol,’* need not be a criminal act. Intentional fault of a quasi-delictual nature suffices to constitute the kind of fraud that vitiates a party’s consent.” Revision Comments at Paragraph (c).

199. Under Louisiana law, delictual fraud or intentional misrepresentation consists of: 1) a misrepresentation of material fact, 2) made with the intent to deceive and 3) causing justifiable reliance and resultant injury. *Becnel v. Grodner*, 2007-1041 (La. App. 4 Cir. 4/2/08), 982 So.2d 891, 894.

200. As set forth herein the Defendants, with the intent to deceive and/or obtain an unjust advantage and/or to cause damage to patients, doctors, payors, and local governments such as Plaintiff, made knowingly false statements and omitted and/or concealed information. The Defendants acted intentionally and/or unlawfully. These actions and omissions constitute fraud, as that term is defined in La. Civ. Code Ann. Art. 1953.

201. As alleged herein the Defendants made false statements regarding their compliance with state and federal law regarding their duties to prevent diversion, their duties to monitor, report and halt suspicious orders, and/or concealed their noncompliance with these requirements.

202. As alleged herein the Defendants knowingly and/or intentionally made representations that were false. The Defendants had a duty to disclose material facts and concealed them. These false representations and concealed facts were material to the conduct and actions at issue. The Defendants made these false representations and concealed facts with knowledge of the falsity of their representations, and did so with the intent of misleading Plaintiff and Plaintiff's Community.

203. These false representations and concealments were reasonably calculated to deceive Plaintiff, Plaintiff's Community, and the physicians who prescribed opioids for persons in Plaintiff's Community, were made with the intent to deceive, and did in fact deceive these persons, Plaintiff, and Plaintiff's Community.

204. Plaintiff, Plaintiff's Community, and the physicians who prescribed opioids reasonably relied on these false representations and concealments of material fact.

205. But for the aforementioned fraudulent conduct of the Defendants [which is ongoing], and the detrimental reliance thereon of doctors, prescribers and patients in the Plaintiff's Community, there would not be a massive opioid addition epidemic that extends into the Plaintiff's Community. However, as a result of the Defendants continuous fraudulent actions alleged herein, Plaintiff has suffered, and continues to suffer damages, including but not limited to the damages described herein.

206. The injuries alleged by Plaintiff herein were sustained as a direct and proximate cause of the Defendants' fraudulent conduct.

207. Plaintiff seeks recovery of economic losses (direct, incidental, or consequential pecuniary losses) resulting from Defendants' fraudulent activity, including fraudulent misrepresentations and fraudulent concealment.

208. Plaintiff seeks all legal and equitable relief as allowed by law, including *inter alia* injunctive relief, restitution, disgorgement of profits, compensatory damages, attorney fees, investigative costs and expenses, and all damages allowed by law to be paid by the Defendants, and costs, and pre- and post-judgment interest.

209. Defendants' misconduct alleged herein is ongoing and persistent.

210. The Defendants' continuing wrongful conduct as alleged herein, including but not limited to its fraud and fraudulent misrepresentations, has foreseeably caused, and continues to cause, damage to Plaintiff and Plaintiff's community, to wit: the incurring of expenses that are not part of the normal and expected costs of a local government's existence, such as but not limited to the following:

a. Losses caused by the decrease in funding available for Plaintiffs' services for which funding was lost because it was diverted to other services designed to address the opioid epidemic;

b. Costs for providing healthcare and medical care, additional therapeutic, and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths;

c. Costs for providing mental-health services, treatment, counseling, rehabilitation services, and social services to victims of the opioid epidemic and their families;

d. Costs for providing treatment of infants born with opioid-related medical conditions, or born dependent on opioids due to drug use by mother during pregnancy;

e. Costs associated with providing care for children whose parents suffer from opioid-related disability or incapacitation, including foster care and other social services cost;

f. Other increased costs associated with opioid addiction and incurred by Plaintiff.

**COUNT VI**
**FALSE ADVERTISING**
**La. Rev. Stat. Ann. §§ 40:625**
**(Against all Defendants)**

211. Plaintiff incorporates by reference all previous allegations within the preceding paragraphs as if fully set forth herein, and further alleges as follows:

212. Louisiana Revised Statute § 40:625(A) provides that:

> An advertisement of a food, drug, device, or cosmetic is false if it is false or misleading in any particular regarding the food, drug, device, or cosmetic. Any representation concerning any effect of a drug or device is false under this Sub-section if it is not supported by demonstrable scientific facts or substantial and reliable medical or scientific opinion.

213. “Advertisement” includes all representations of fact or opinion disseminated to the public in any manner or by any means other than by the labeling.

214. Defendants violated La. Rev. Stat. Ann. §40:625 as they engaged in false advertising in the conduct of a business, trade or commerce in this State.

215. As set forth herein, Defendants, directly and through third parties, violated La. Rev. Stat. Ann. §40:625 by making and disseminating untrue, false and misleading advertisements to consumers in this State and in Plaintiff’s Community promoting the sale and use of opioids to treat chronic pain, and by causing untrue, false, and misleading advertisements about opioids to be made or disseminated to Louisiana consumers in order to promote the sale and use of opioids to treat chronic pain. These untrue, false, and misleading statements in advertisements and other patient brochures included, but were not limited to:

a. Misrepresenting the truth about how opioids lead to addiction;

b. Misrepresenting that opioids improve function;

c. Misrepresenting that addiction risk can be managed;

d. Misleading patients through the use of terms like "pseudoaddiction";

e. Falsely claiming that withdrawal is simply managed;

f. Misrepresenting that increased doses pose no significant additional risks;

g. Falsely omitting or minimizing the adverse effects of opioids and overstating the risks of alternative forms of pain treatment.

216. At all times relevant to this Complaint, Defendants, directly, and through third parties, and by aiding and abetting third parties, also violated La. R.S. § 40:625 through misleading advertisements in various marketing channels, including but not limited to: advertisements, brochures, and other patient education materials that omitted or concealed material facts to promote the sale and use of opioids to treat chronic pain. Defendants repeatedly failed to disclose or minimized material facts about the risks of opioids, including the risk of addiction, and their risks compared to alternative treatments. Such material omissions were deceptive and misleading in their own right, and further rendered even otherwise truthful statements about opioids untrue, false, and misleading, creating a misleading impression of the risks, benefits, and superiority of opioids for treatment of chronic pain.

217. Defendants knew at the time of making or disseminating these misstatements and material omissions, or causing these misstatements and material omissions statements to be made or disseminated, that they were untrue, false, or misleading and therefore likely to deceive the public. In addition, Defendants knew or should have known that their marketing and promotional efforts created an untrue, false, and misleading impression of the risks, benefits, and superiority of opioids. This conduct remains ongoing.

218. In sum, Defendants: (a) directly engaged in untrue, false, and misleading advertising; (b) disseminated the untrue, false, and misleading advertisements through third parties; and (c) aided and abetted the untrue, false, and misleading advertising by third parties.

219. All of this conduct, separately and collectively, was intended to deceive Louisiana consumers and the political subdivisions of the State, including the Parish of DeSoto, who bore increased costs associated with foreseeable criminal activity arising from the rise in addiction that was a direct consequence of Defendants' promotion of misleading advertisements about opioid risks and benefits.

220. Defendants’ misconduct alleged herein is ongoing and persistent.

221. The Defendants' continuing wrongful conduct as alleged herein, including but not limited to its false advertising, has foreseeably caused, and continues to cause, damage to Plaintiff and Plaintiff’s community, to wit: the incurring of expenses that are not part of the normal and expected costs of a local government’s existence, such as but not limited to the following:

> a. Losses caused by the decrease in funding available for Plaintiffs’ services for which funding was lost because it was diverted to other services designed to address the opioid epidemic;
>
> b. Costs for providing healthcare and medical care, additional therapeutic, and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths;
>
> c. Costs for providing mental-health services, treatment, counseling, rehabilitation services, and social services to victims of the opioid epidemic and their families;
>
> d. Costs for providing treatment of infants born with opioid-related medical conditions, or born dependent on opioids due to drug use by mother during pregnancy;
>
> e. Costs associated with providing care for children whose parents suffer from opioid-related disability or incapacitation, including foster care and other social services cost;
>
> f. Other increased costs associated with opioid addiction and incurred by Plaintiff.

**COUNT VII**
**RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT**
**18 U.S.C. 1961, *et seq.*[1]**
**(Against All Defendants)**

222. Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein, and further alleges as follows.

223. Plaintiff brings this Count against all defendants, who are referred to in this Count as the "RICO Defendants".

224. At all relevant times, the RICO Defendants were "persons" under 18 U.S.C. § 1961(3) because they are entities capable of holding, and do hold, "a legal or beneficial interest in property."

225. Section 1962(a) of RICO makes it unlawful "for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity … in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. 1962 (a); *St. Paul Mercury v. Williamson*, 224 F. 3d 425, 441 (5th Cir. 2000).

226. Section 1962(b) of RICO makes it unlawful "for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

[1] For convenience, Sections of the so-called RICO statute are referred to as, for example, "Section 1962 (a) or Section 1962 (b)" and so forth.

227. Section 1962(c) of RICO makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly," in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c); *St. Paul Mercury v. Williamson*, 224 F. 3d 425, 445 (5th Cir. 2000).

**A. THE RICO ENTERPRISE**

228. The term "enterprise" is defined as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4); *Turkette*, 452 U.S. at 580; *Boyle v. U.S.*, 556 U.S. 938, 944 (2009); *Crow v. Henry*, 43 F.3d 198, 204-205 (5th Cir. 1995). The definition of "enterprise" in Section 1961(4) includes legitimate and illegitimate enterprises within its scope. Specifically, the section "describes two separate categories of associations that come within the purview of an 'enterprise' -- the first encompassing organizations such as corporations, partnerships, and other 'legal entities,' and the second covering 'any union or group of individuals associated in fact although not a legal entity.'" *Id*. *Turkette*, 452 U.S. at 577. The second category is not a more generalized description of the first. *Id*.

229. As set forth herein, the Controlled Substances Act, 21 U.S.C. § 821, *et seq*. (the "CSA"), establishes a "closed" system for "the manufacturing, distributing and dispensing of controlled substances." The linchpin of this system is the registration with the DEA of all persons who manufacture or distribute controlled substances. Although this statute requires registration with the "Attorney General in accordance with Rules and Regulation promulgated by him," the Attorney General has delegated his functions under the CSA to the DEA. See 28 C.F.R. 0.100.

230. Central to the closed system created by the CSA was the directive that the DEA determine quotas of each basic class of Schedule I and II controlled substances each year. The quota system was intended to reduce or eliminate diversion from "legitimate channels of trade" by controlling the "quantities of the basic ingredients needed for the manufacture of [controlled substances], and the requirement of order forms for all transfers of these drugs."

231. DEA's quota system for the basic classes of controlled substances consists of three types of quota summarized below: Aggregate Production Quota (APQ), Individual Manufacturing Quota, and Procurement Quota.

- *Aggregate Production Quota*: The Administrator determines the total amount of each basic class of Schedule I and II controlled substance necessary to be manufactured in a calendar year to provide for the estimated medical, scientific, research, and industrial need of the United States, for lawful export requirements, and for the establishment and maintenance of reserve stocks.
- *Individual Manufacturing Quota*: Amount of a basic class allocated to registered bulk manufacturers in order to manufacture the substance by producing, preparing, propagating, compounding, or processing it from another substance.
- *Procurement Quota*: Issued to registered manufacturers who desire to obtain any Schedule I and/or II basic class of controlled substances in order to further manufacture that substance by packaging, repackaging, labeling, relabeling, or producing dosage forms or other substances.[2]

DEA establishes the APQ for approximately 200 Schedule I and II controlled substances annually. Once issued, a quota may be increased or decreased, as appropriate. Any registrant who holds

[2] *Id.*

an individual manufacturing quota for a basic class of a Schedule I or II controlled substance may, at any time, request an increase in that quota in order to meet estimated net disposal, inventory, and other requirements during the remainder of the year. In addition, the Administrator may, at any time, reduce an individual manufacturing quota for a basic class of controlled substance in order to prevent the aggregate of the individual manufacturing quotas from exceeding the APQ for that basic class.

232. The DEA considers the following factors in its determination of quotas:

a. Information provided by the Department of Health and Human Services;

b. Total net disposal of the basic class by all manufacturers;

c. Trends in the national rate of net disposal of the basic class;

d. An applicant's production cycle and current inventory position;

e. Total actual or estimated inventories of the class and of all substances manufactured from the class and trends in inventory accumulation; and

f. Other factors such as: changes in the currently accepted medical use of substances manufactured for a basic class; the economic and physical availability of raw materials; yield and sustainability issues; potential disruptions to production; and unforeseen emergencies.

233. For more than a decade, the RICO Defendants aggressively sought to sell their dangerous products, enhance revenues and profits, and increase their share of the prescription painkiller market, by unlawfully and surreptitiously increasing the volume of sales of opioid medications. However, the Defendants are not permitted to engage in a limitless expansion of their market through the unlawful sales of regulated painkillers. As "registrants," the Defendants operated and continue to operate within the "closed-system" created under the CSA. The CSA restricts the RICO Defendants' ability to manufacture or distribute Schedule II substances like opioids by requiring them to: (1) register to manufacture or distribute opioids; (2) to maintain

complete and accurate inventories and records of transactions involving controlled substances (3) maintain effective controls against diversion of the controlled substances that they manufacturer or distribute; (4) design and operate a system to identify suspicious orders of controlled substances, halt such unlawful sales, and report them to the DEA; and (5) make sales within a limited quota set by the DEA for the overall production of Schedule II substances like opioids.

234. It is unlawful for a registrant to manufacture a controlled substance in Schedule II, such as prescription opioids, that is (1) not expressly authorized by its registration and by a quota assigned to it by DEA, or (2) in excess of a quota assigned to it by the DEA.

235. Upon information and belief, the RICO Defendants [i.e. as members of the RICO Enterprise (as defined below)], finding it impossible to legally achieve the level of opioid sales which they desired, systematically and fraudulently violated their statutory and legal duty to maintain effective controls against diversion of their drugs, and/or to design and operate a system to identify suspicious orders of their drugs, and/or to halt unlawful sales of suspicious orders, and/or to notify the DEA of suspicious orders. As discussed in detail herein, the RICO Defendants, as members of the RICO Enterprise (sometimes hereinafter “RICO Enterprise” or “Enterprise”) repeatedly engaged in unlawful sales of opioids which, in turn, artificially and illegally increased the annual production quotas for opioids established by the DEA. In doing so, the RICO Defendants worked together to cause hundreds of millions of pills to enter the illicit market, which in turn, allowed them to generate huge profits and which created the opioid epidemic which has damaged Plaintiff.

236. The conduct of the Defendants, and their continuing conduct, has occurred through legitimate and illegitimate means. The Pharmaceutical Defendants and the Distributor Defendants formed an association-in-fact enterprise and, within and among them, individual enterprises which,

in turn, joined their larger association-in-fact enterprise. The RICO Defendants were associated with, conducted and participated in, and engaged in decision-making in the Enterprise. The RICO Defendants further derived substantial income from a pattern of racketeering activity and invested all or a part of that income to operate the Enterprise, whose purpose was to engage in the unlawful sales of opioids and deceive the public and federal and state regulators into believing that opioids were safe and that the RICO Defendants were fulfilling their statutory obligations. As a direct result of the RICO Defendants' scheme(s), course of conduct, and pattern of racketeering activity, they were able to derive substantial revenue and profits from the American public, including in Plaintiff's Community, while entities like the Plaintiff (as well as Plaintiff's Community) experienced injury caused by the reasonably foreseeable consequences of the prescription opioid addiction epidemic. As explained in detail below, the RICO Defendants' misconduct violated Sections 1962(a), 1962(b), and 1962(c) and 1962(d).

237. Alternatively, the RICO Defendants were members of a legal entity enterprise within the meaning of 18 U.S.C. § 1961(4), through which the RICO Defendants conducted their pattern of racketeering activity in this jurisdiction and throughout the United States; to wit, the Healthcare Distribution Alliance (the "HDA"). The HDA is a distinct legal entity that satisfies the definition of a RICO enterprise. The HDA is a non-profit corporation formed under the laws of the District of Columbia. As a non-profit corporation, HDA qualifies as an "enterprise" within the definition set out in 18 U.S.C. § 1961(4) because it is a corporation and a legal entity.

238. Upon information and belief, each of the RICO Defendants is a member, participant, and/or sponsor of the HDA and utilized the HDA to conduct the RICO Enterprise and to engage in the pattern of racketeering activity that gives rise to this Count.

239. Each of the RICO Defendants is a legal entity separate and distinct from the HDA. And, the HDA serves the interests of distributors and manufacturers beyond the RICO Defendants. Therefore, the HDA exists separately from the RICO Enterprise, and each of the RICO Defendants exists separately from the HDA. Therefore, the HDA may serve as a RICO enterprise.

240. The legal and association-in-fact enterprises alleged in the previous and subsequent paragraphs were each used by the RICO Defendants to conduct the RICO Enterprise by engaging in a pattern of racketeering activity. Therefore, the legal and association-in-fact enterprises alleged in the previous and subsequent paragraphs are pled in the alternative and are collectively referred to as the "RICO Enterprise."

241. At all relevant times, the RICO Enterprise: (a) had an existence separate and distinct from each individual RICO Defendant; (b) was separate and distinct from the pattern of racketeering in which the RICO Defendants engaged; (c) was an ongoing and continuing organization consisting of legal entities and/or an association-in-fact, including each of the RICO Defendants; (d) characterized by interpersonal relationships among the RICO Defendants; (e) had sufficient longevity for the enterprise to pursue its purpose; and (f) functioned as a continuing unit. *Turkette*, 452 U.S. at 580; *Boyle,* 556 U.S. at 944 (2009). Each member of the RICO Enterprise participated in the conduct of the enterprise, including patterns of racketeering activity, and shared in the skyrocketing growth of profits obtained as a result of the RICO Defendants' scheme.

242. The RICO Enterprise functioned by selling prescription opioids. While there are some legitimate uses and/or needs for prescription opioids, the RICO Defendants, through their illegal enterprise, engaged in a pattern of racketeering activity, that involved a fraudulent scheme to increase revenue by violating State and Federal laws requiring the maintenance of effective controls against diversion of prescription opioids, and the identification, investigation, and reporting of suspicious orders of prescription opioids destined for the illicit drug market. The goal of the RICO

Defendants' scheme was to increase profits from opioid sales. But, the RICO Defendants' profits were limited by the production quotas set by the DEA, so the RICO Defendants refused to identify, investigate, and/or report suspicious orders of their prescription opioids being diverted into the illicit drug market. The end result of this strategy was to increase and maintain artificially high production quotas of opioids so that there was a larger pool of opioids for the RICO Defendants to manufacture and distribute for public consumption.

243. The RICO Defendants operated as an association-in-fact; alternatively, a legal entity enterprise, to improperly and illegally increase sales and revenues in order to unlawfully increase quotas set by the DEA and, in turn, to collectively profit from manufacturing and distribution of greater and greater pools of opioids each year. Each member of the RICO Enterprise participated in the conduct of the enterprise including patterns of racketeering activity. Each shared profits generated by the scheme.

244. The RICO Enterprise engaged in, and its activities affected, interstate and foreign commerce because the enterprise involved commercial activities across states lines, such as manufacture, sale, distribution, and shipment of prescription opioids throughout the Plaintiff's Community and this jurisdiction, and the corresponding payment and/or receipt of money from the sale of the same.

245. Within the RICO Enterprise, there were interpersonal relationships and common communication by which the RICO Defendants shared information on a regular basis. These interpersonal relationships also formed the organization of the RICO Enterprise. The RICO Enterprise used their interpersonal relationships and communication network for the purpose of conducting the Enterprise through a pattern of racketeering activity.

246. Each RICO Defendant communicated with the other RICO Defendants and with others in the chain of distribution on a regular basis by participating in joint lobbying efforts, trade

industry organizations and contractual relations, sharing of information, observation of activities and behaviors at the market place, and by other means. For example, but not exclusively, the RICO Defendants worked together through Advocacy Groups to spend multimillions **of dollars** in lobbying across the United States. These funds were used to enable and operate the RICO Enterprise. Defendants and their Advocacy Groups have engaged in extensive lobbying efforts to either defeat legislation restricting opioid prescribing or promote laws encouraging opioid treatment for pain. Another non-exclusive example: upon information and belief, the RICO Defendants, through their Advocacy Groups and/or through the HDA engaged in lobbying efforts to weaken the DEA's enforcement authority. Another non-exclusive example: Upon information and belief, the RICO Defendants were all members of the Pain Care Forum ("PCF"). According to an article published by the Center for Public Integrity and The Associated Press, the PCF has been lobbying on behalf of the Pharmaceutical Defendants and the Distributor Defendants for more than a decade; and from 2006 through 2015 participants in the PCF spent more than $740 million lobbying "in the nation's capital and in all 50 state houses on an array of issues, including opioid-related measures…" Plaintiff is informed and believes that the RICO Defendants worked together as an ongoing and continuous organization throughout the existence of the Enterprise.

247. The RICO Defendants participated in the operation and management of the RICO Enterprise by directing its affairs, as described herein. The RICO Defendants exerted substantial control over the RICO Enterprise by their membership in the Pain Care Forum, the HDA, and through their contractual relationships.

## A. CONDUCT OF THE RICO ENTERPRISE

248. During the time period alleged in this Complaint, the RICO Defendants exerted control over, conducted and participated in the RICO Enterprise by fraudulently failing to comply

with their federal and state obligations to identify, investigate and report suspicious orders of opioids, and to halt such unlawful sales, all for the purpose of increasing production quotas and generating unlawful profits, as follows:

249. As set forth herein, the RICO Defendants disseminated false and misleading statements to the public regarding the safety of opioid use. They also disseminated false and misleading statements assuring their compliance with obligations to protect the public against theft, suspicious orders, diversion, over-prescriptions, mis-prescriptions and false information about opioid medications.

250. As set forth herein, the RICO Defendants paid nearly $800 million dollars to influence local, state, and federal governments through joint lobbying efforts as part of the PCF. The RICO Defendants were all members of the PCF either directly or indirectly through the HDA. The lobbying efforts of the PCF and its members, included efforts to pass legislation making it more difficult for the DEA to suspend and/or revoke the registrations of drug manufacturers and distributors for failure to report suspicious orders of opioids.

251. As set forth herein, the RICO Defendants failed to comply with their legal duties under the CSA, including refusal and/or failure to identify, investigate or report suspicious activities of the marketplace and failure to identify and report drug diversion rings about which they had actual knowledge. The RICO Defendants worked together to ensure that opioid production quotas continued to increase, allowing them to generate more and more profits from their illegal Enterprise. For example, but not exclusively, the Pharmaceutical Defendants lobbied the DEA to increase Aggregate Production Quotas, year after year, by submitting “net disposal information” that the Pharmaceutical Defendants knew included sales that were suspicious and involved the diversion of opioids that had not been properly investigated or reported by the RICO

Defendants. It is averred that since the DEA was unaware that false and inaccurate “net disposal information” was being submitted, the DEA unwittingly increased the production quotas for prescription opioids.

252. Upon information and belief, the RICO Defendants engaged in an industry-wide practice of paying rebates and chargebacks to incentivize unlawful opioid prescription sales. As set forth hereinabove, a chargeback is a payment made by a manufacturer to a distributor after the distributor sells the manufacturer’s product at a price below a specified rate. After a distributor sells a manufacturer’s product to a pharmacy, for example, the distributor requests a chargeback from the manufacturer and, in exchange for the payment, the distributor identifies to the manufacturer the product, volume and the pharmacy to which it sold the product. Moreover, as a result, the Pharmaceutical Defendants knew – just as the Distributor Defendants knew – the volume, frequency, and pattern of opioid orders being placed and filled. The Pharmaceutical Defendants built receipt of this information into the payment structure for the opioids provided to the Distributor Defendants. The Pharmaceutical Defendants used the chargeback program to acquire detailed, high-level data regarding sales of the opioids they manufactured. And the Pharmaceutical Defendants used this high-level information to direct the Distributor Defendants’ sales efforts to regions where prescription opioids were selling in larger volumes. Thus, like the Distributor Defendants, the Pharmaceutical Defendants had access to and possession of the information necessary to monitor, report, and prevent suspicious orders and to prevent diversion.

253. The RICO Defendants worked together to control the flow of information and influence state and federal governments and political candidates to pass legislation that was pro-opioid. The Pharmaceutical and Distributor Defendants did this in pertinent part through their participation in the PCF and HDA.

254. The RICO Defendants exerted substantial control over the RICO Enterprise by their membership in the organizations set forth herein and through their contractual relationships (such as, but not exclusively, rebate or chargeback agreements).

255. As RICO scheme participants, the RICO Defendants engaged in intentional steps to conceal their scheme. As set forth herein, they used unbranded advertisements, third parties, Advocacy Groups, and other methods to disguise the sources of their fraudulent statements, increase the effectiveness of their misinformation campaign, deceive hospitals, doctors and patients, and sell more and more quantities of opioids.

## B. PATTERN OF RACKETEERING ACTIVITY

256. In pertinent part, the term "racketeering activity" is defined as "(A) any act or threat involving … or dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year; … (B) any act which is indictable under any of the following provisions of title 18, United States Code: … Section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), … (D) any offense involving fraud connected with a case under title 11 (except a case under section 157 of this title), fraud in the sale of securities, *or the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act)*, punishable under any law of the United States, …" 18 U.S.C. § 1961(1)(A)-(D) (*emphasis* supplied).

257. The RICO Defendants conducted and participated in the conduct of the RICO Enterprise through a pattern of racketeering activity as defined in 18 U.S.C. § 1961(1)(B), including mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343); and 18 U.S.C. §

1961(1)(D) by the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substance Act), punishable under any law of the United States.

258. The RICO Defendants carried out, or attempted to carry out, a scheme to defraud federal and state regulators, and the American public by knowingly conducting or participating in the conduct of the RICO Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) that employed the use of mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

259. The RICO Defendants committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity (i.e. violations of 18 U.S.C. §§ 1341 and 1343), the last of which occurred within ten years after the commission of the prior act of racketeering activity. 18 U.S.C. § 1961(5). The multiple acts of racketeering activity that the RICO Defendants committed, or aided and abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by the RICO Defendants' regular use of the facilities, services, distribution channels, and employees of the RICO Enterprise. The RICO Defendants participated in the scheme to defraud by using mail, telephone and the Internet to transmit mailings and wires in interstate or foreign commerce.

260. The pattern of racketeering activity alleged herein is continuing as of the date of this Complaint and, upon information and belief, will continue into the future unless enjoined by this Court.

261. The RICO Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to:

a. Mail Fraud: The RICO Defendants violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the prescription opioids by means of false pretenses, misrepresentations, promises, and omissions.

b. Wire Fraud: The RICO Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the prescription opioids by means of false pretenses,

262. Each time a participant in the RICO scheme distributed (or distributes) a false statement by mail or wire, or via the Internet, it committed (or commits) a separate act of mail or wire fraud contrary to 18 USC §§ 1341 and 1342 respectively.

263. Each RICO Defendant used (or uses) thousands of pieces of interstate mail and of interstate wire communications and email to accomplish their scheme through virtually uniform misrepresentations, concealments, false and material omissions, and deceptions concerning opioid products, and regarding their compliance with their mandatory reporting requirements. The pattern was (and is) one of racketeering activity intentionally committed and participated in, by each said Defendant, to carry out their unlawful goal of selling prescription opioids without reporting suspicious orders or the diversion of opioids into the illicit market.

264. The RICO Defendants' use of the mail and wires includes, but is not limited to, the transmission, delivery, or shipment of the following by the Manufacturers, Distributors, or third parties that were foreseeably caused to be sent as a result of the RICO Defendants' illegal scheme, including but not limited to:

a. The prescription opioids themselves;

b. Documents and communications that facilitated the manufacture, purchase and unlawful sale of prescription opioids;

c. Defendants' DEA registrations;

d. Documents and communications that supported and/or facilitated Defendants' DEA registrations;

e. Documents and communications that supported and/or facilitated the Defendants' request for higher aggregate production quotas, individual production quotas, and procurement quotas;

f. Defendants' records and reports that were required to be submitted to the DEA pursuant to 21 U.S.C. § 827;

g. Documents and communications related to the Defendants' mandatory DEA reports pursuant to 21 U.S.C. § 823 and 21 C.F.R. § 1301.74;

h. Documents intended to facilitate the manufacture and distribution of Defendants' prescription opioids, including bills of lading, invoices, shipping records, reports and correspondence;

i. Documents for processing and receiving payment for prescription opioids;

j. Payments from the Distributors to the Manufacturers;

k. Rebates and chargebacks from the Manufacturers to the Distributors;

l. Payments to Defendants' lobbyists through the Pain Care Forum;

m. Payments to Defendants' trade organizations, like the HDA, for memberships and/or sponsorships;

n. Deposits of proceeds from Defendants' manufacture and distribution of prescription opioids; and

o. Other documents and things, including electronic communications.

265. Each Defendant was a "registrant," as alleged herein, and required to comply with the CSA. Each Defendant knowingly and intentionally failed and refused to do so and conspired with the others to conceal their non-compliance and accomplish their scheme.

### C. DAMAGES

266. There is a grave and immediate threat of continuing and ongoing wrongful conduct and harm by the RICO Defendants, who have paid massive fines and penalties (some of which are set forth herein), but whose subsequent actions evidence that fines and penalties are merely a cost of doing business in an industry that generates billions of dollars in revenue.

267. The RICO Defendants' violations of law and their pattern of racketeering activity foreseeably, directly, and proximately caused Plaintiff injury in its business and property because Plaintiff has incurred increased costs associated with the opioid epidemic, as described above in allegations expressly incorporated herein by reference. But for the RICO Defendants' conduct, Plaintiff would not have suffered the damages alleged herein, such as but not limited to the following:

a. Losses caused by the decrease in funding available for Plaintiffs' services for which funding was lost because it was diverted to other services designed to address the opioid epidemic;

b. Costs for providing healthcare and medical care, additional therapeutic, and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths;

c Costs for providing mental-health services, treatment, counseling, rehabilitation services, and social services to victims of the opioid epidemic and their families;

d. Costs for providing treatment of infants born with opioid-related medical conditions, or born dependent on opioids due to drug use by mother during pregnancy;

e. Costs associated with providing care for children whose parents suffer from opioid-related disability or incapacitation;

n. Other increased costs associated with opioid addiction incurred by Plaintiff.

268. Plaintiff is the most directly harmed entity and there is no other Plaintiff better suited to seek a remedy for the economic harms at issue here.

269. Plaintiff seeks all legal and equitable relief as allowed by law, including *inter alia* actual damages, treble damages, equitable relief, forfeiture as deemed proper by the Court, attorney fees and all costs and expenses of suit and pre- and post-judgment interest.

270. Pursuant to 18 USC § 1964 (c) Plaintiff is further entitled to recover treble damages.

**COUNT X**
**LOUISIANA RACKETEERING ACT**
**La. Rev. Stat. Ann. § 15:1351 *et seq*.**
**(Against All Defendants)**

271. Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth here, and further alleges as follows.

272. Plaintiff has standing to bring this action as a "person who is injured by reason of any violation of the provisions of R.S. 15:1353." La. Rev. Stat. Ann. § 15:1356(E).

273. The Louisiana Racketeering Act prohibits "committing, attempting to commit, conspiring to commit, or soliciting, coercing, or intimidating another person to commit any crime that is punishable under ... the Uniform Controlled Dangerous Substances Law," among other enumerated acts. La. Rev. Stat. Ann. § 15:1352(A). Opioids are classified as both Schedule I and Schedule II drugs under Louisiana law. La. Rev. Stat. Ann. § 40:964. The Louisiana Uniform Controlled Dangerous Substances Law explicitly provides that "[p]hysical dependence is an expected result of opioid use." La. Rev. Stat. Ann. § 40:961(29.1). Unauthorized manufacture, distribution, or dispensing of opioids constitute predicate acts of racketeering activity under the Louisiana Racketeering Act. La. Rev. Stat. Ann. § 15:1352(A)(13) (citing La. Rev. Stat. Ann. § 40:967(A)).

274. The RICO Defendants violated section 15:1353 of the Louisiana Racketeering Act by knowingly, intentionally, and unlawfully aiding and abetting each other to commit violations of the Louisiana Uniform Controlled Dangerous Substances Law.

275. The RICO Defendants also violated section 15:1353 of the Louisiana Racketeering Act by knowingly receiving "proceeds derived, directly or indirectly, from a pattern of racketeering activity to use or invest, whether directly or indirectly, any part of such proceeds, or the proceeds derived from the investment or use thereof, in the acquisition of any title to, or any

right, interest, or equity in immovable property or in the establishment or operation of any enterprise." La. Rev. Stat. Ann. § 15:1353(A).

276. The RICO Defendants conducted the RICO Enterprise, as defined above, through a pattern of racketeering activity in violation of Section 15:1353(C) and have conspired to violate Section 15:1353(C) in violation of Section 15:1353(D). La. Rev. Stat. Ann. § 15:1353.

277. The RICO Defendants violated Section 15:1353(D) by knowingly, intentionally, and unlawfully aiding and abetting each other and the RICO Enterprise and conspired to conduct and participate, directly and indirectly, in the conduct of the RICO Enterprise, through the pattern of racketeering activity described herein. La. Rev. Stat. Ann. § 15:1353(D).

278. The RICO Defendants' RICO Enterprise existed as an "enterprise" as defined in Section 15:1352(B). The RICO Defendants' RICO Enterprise existed as an association in fact and included unlawful as well as lawful enterprises. La. Rev. Stat. Ann. § 15:1352(B).

279. As described above and as fully incorporated herein, the violations set forth herein, which have been continuous in nature, constitute "racketeering activity" within the meaning of sections 15:1352(C) and 15:1353, with at least two such acts of racketeering activity having occurred within ~~the past~~ five years of each other.[3]

280. The RICO Defendants' violations of law and their pattern of racketeering activity foreseeably, directly, and proximately caused Plaintiff injury in its business and property because Plaintiff paid for costs (in excess of the norm) associated with the opioid epidemic, as described above in allegations expressly incorporated herein by reference.

281. The RICO Defendants' violations of law and their pattern of racketeering activity foreseeably, directly, and proximately caused Plaintiff injury in its business and property because

[3] See note 170, *supra*.

Plaintiff has incurred increased costs associated with the opioid epidemic, as described above in allegations expressly incorporated herein by reference. But for the RICO Defendants' conduct, Plaintiff would not have suffered the damages alleged herein, such as but not limited to the following:

> a. Losses caused by the decrease in funding available for Plaintiffs' services for which funding was lost because it was diverted to other services designed to address the opioid epidemic;
>
> b. Costs for providing healthcare and medical care, additional therapeutic, and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths;
>
> c. Costs for providing mental-health services, treatment, counseling, rehabilitation services, and social services to victims of the opioid epidemic and their families;
>
> d. Costs for providing treatment of infants born with opioid-related medical conditions, or born dependent on opioids due to drug use by mother during pregnancy;
>
> e. Costs associated with providing care for children whose parents suffer from opioid-related disability or incapacitation;
>
> f. Other increased costs associated with opioid addiction incurred by Plaintiff.

282. Plaintiff is the most directly harmed entity and there is no other Plaintiff better suited to seek a remedy for the economic harms at issue here.

283. Plaintiff seeks all legal and equitable relief as allowed by law, including *inter alia* actual damages, treble damages, equitable relief, forfeiture as deemed proper by the Court, attorney fees and all costs and expenses of suit and pre- and post-judgment interest. La. Rev. Stat. Ann. § 15:1356(E).

**WHEREFORE**, Plaintiff, Bridge House Corporation, prays that the Court:

A. Enter Judgment in favor of the Plaintiff against each of the Defendants jointly, severally and *in solido* for all damages hereinabove alleged and which have been alleged to have been caused by the actions of the Defendants;

B. Enjoin the Defendants and their employees, officers, directors, agents, successors, assignees, merged or acquired predecessors, parent or controlling entities, subsidiaries, and all other persons acting in concert or participation with it, from engaging in unfair or deceptive practices in violation of law and ordering temporary, preliminary or permanent injunction;

C. Award treble damages, penalties and costs pursuant to La. Rev. Stat. Ann. §51:1409(A).

D. Award restitution, disgorgement of profits, actual damages, treble damages, forfeiture as deemed proper by the Court, and attorney fees and all costs and expenses of suit pursuant to Plaintiff's LUTPA claims;

E. Award compensatory damages in favor of the Plaintiff for past and future costs to abate the ongoing public nuisance caused by the opioid epidemic, including restitution;

F. Award attorney fees pursuant to La. Civil Code Art. 1958;

G. Award actual damages, treble damages, injunctive and equitable relief, forfeiture as deemed proper by the Court, and attorney fees and all costs and expenses of suit pursuant to Plaintiff's racketeering claims;

H. Award actual damages, treble damages, injunctive and equitable relief, forfeiture as deemed proper by the Court, and attorney fees and all costs and expenses of suit pursuant to Plaintiff's Lanham Act claims;

I. Order Defendants to fund an "abatement fund" for the purposes of abating the opioid nuisance;

J. Award the Plaintiff all damages incurred by it and caused by the opioid epidemic, including but not limited to: (1) costs for providing medical care, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths; (2) costs for providing treatment, counseling, and rehabilitation services; (3) costs for providing treatment of infants born with opioid-related medical conditions; (4) costs for providing care for children whose parents suffer from opioid-related disability or incapacitation and costs for providing treatment of infants born with opioid-related medical conditions, or born dependent on opioids due to drug use by mother during pregnancy; (5) cost of establishing and maintaining such program or programs to provide needed treatment, counselling and/or rehabilitation services to persons in Plaintiff's Community affected by opioid addiction; and (7) any and all other increased costs associated with opioid addiction.

K. Award the cost of investigation, reasonable attorney fees, and all costs and expenses, pre-judgment and post-judgment interest;

L. Order the Sackler Family Defendants to pay to the Purdue Entities all funds received as distributions or dividends in violation of the Louisiana Revocatory Action statutes.

M. Award all such other relief including damages as provided by law and/or as the Court deems appropriate and just.

This 15th day of March, 2019.

Respectfully submitted,

LOWE, STEIN, HOFFMAN,
ALLWEISS & HAUVER, LLP

*/s/ MARK S. STEIN*
MARK S. STEIN (#12428)
MICHAEL R. ALLWEISS (#2425)
701 Poydras Street, Suite 3600
New Orleans, Louisiana
Telephone: (504) 581-2450
Facsimile: (504) 581-2461

Scott R. Bickford (#1165)
Lawrence J. Centola, III (#27402)
MARTZELL, BICKFORD, & CENTOLA
338 Lafayette Street
New Orleans, Louisiana 70130
Telephone: (504) 581-9065
Email: srb@mbfirm.com
Email: ljc@mbfirm.com

Barry Cooper (#27202)
COOPER LAW FIRM, LLC
508 Rue Saint Phillip Street
New Orleans LA 70116
Telephone: (504) 566-1558
Email: bcooper@sch-llc.com

Billy Gibbens, 27225
SCHONEKAS, EVANS, MCGOEY
& MCEACHIN, L.L.C.
909 Poydras Street, Suite 1600
New Orleans, Louisiana 70112
Telephone: (504) 680-6050
Facsimile: (504) 680-6051
Email: billy@semmlaw.com

Attorneys for Plaintiff

**SERVICE OF PROCESS:**
**By waiver, pursuant to Rule 4(d) of the F.R.CP.**

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the above and foregoing Amended Complaint, has been served electronically via the Court's ECF system, on the 15th day of March, 2019.

*/s/ MARK S. STEIN*

MARK S. STEIN